Charles MASCUILLI

v.

**AMERICAN EXPORT ISBRANDTSEN LINES, INC.**

v.

**ATLANTIC & GULF STEVE-DORES, INC.**

Civ. A. No. 70–3416.

United States District Court,
E. D. Pennsylvania.

Aug. 23, 1974.

Arnold Levin, Freedman, Borowsky & Lorry, Philadelphia, Pa., for plaintiff.

Thomas Lane Anderson, Philadelphia, Pa., for American Export Isbrandtsen Lines, Inc.

Clayton H. Thomas Jr., Philadelphia, Pa., for Atlantic & Gulf Stevedores, Inc.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

This is an action for damages for personal injuries suffered by a longshoreman when he was struck by ship's dunnage which was alleged to be improperly banded and which slid off a forklift truck which was being driven along the pier during cargo operations. After a lengthy trial on the issue of liability, the jury returned answers to 18 special interrogatories. From those answers we molded a verdict for the defendant, and it is that decision which is challenged in plaintiff's post-trial motion.[1] The case requires that we further refine, in a novel factual situation. and in the wake of the decision in Victory Carriers v. Law, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971), the shoreside limits of the maritime jurisdiction, which by Act of Congress, 46 U.S.C. § 740 (the Admiralty Extension Act of 1948), "shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land."

### I. *The Facts*

The facts surrounding the plaintiff's accident were developed at length at trial. They may be briefly summarized as follows. Plaintiff was a longshoreman employed by the third party defendant Atlantic & Gulf Stevedores, Inc. ("Atlantic & Gulf"), and on the day of the accident was working in connection with the cargo operations of the defendant's vessel, the S. S. Executor. Between 8:00 and 9:00 a. m., several hours before the accident, the plaintiff's co-employees discharged from the ship several drafts or loads of dunnage, that is, assorted lumber which every ship has in its hold and which is used, inter alia, to separate cargo or make a floor to support it. Dunnage used on a ship is the property of a shipowner. The drafts of dunnage were lifted out of the hold and onto the pier by means of lumber bridles, which are two straps each having a choker device which pulls the strap tight when the load is lifted. When the dunnage was landed on the pier the lumber bridles were removed and the dunnage sat unbanded on the pier.

That afternoon it became necessary to move some of the dunnage to another place on the pier. To accomplish this, the plaintiff's co-employee, Elton Grogans, lifted a stack of dunnage on the forks of a chisel (a forklift truck) and drove the chisel along the pier. The stack of dunnage being moved by the chisel was approximately three or three and a half feet high, consisting of perhaps a few hundred sticks of lumber each about an inch thick, four to eight inches wide, and six to ten feet long. As the chisel passed near the plaintiff, a few sticks of dunnage slid off the unbanded stack to the side, striking the plaintiff and causing his injuries. The cargo operations were being performed by Atlantic & Gulf under the direction of its foremen and gang bosses. While there was testimony by plaintiff's expert, Captain William

---

1. The plaintiff also moved for a new trial on the grounds that the verdict was against the weight of the evidence and the law. After reviewing the transcript, we believe that the evidence, which was basically not in dispute, overwhelmingly supports the verdict. Indeed, plaintiff did not press this aspect of the motion in his briefs.

Ash, that the Master of the vessel "is in charge of cargo operations on a merchant vessel," there was no evidence that any of the vessel's personnel exercised any such control or that they were even present or in any way involved in the cargo operations in question.

Because of the complexity of the legal issues involved in the case and the variety of theories of recovery, we submitted to the jury 18 special interrogatories which addressed all of the critical facts which might affect the outcome. In this way we would be able to mold a verdict regardless of what legal principle might ultimately control. In its answers to those special interrogatories, which are attached to this Opinion as an appendix, the jury found facts which may be summarized as follows:

1. The dunnage striking the plaintiff was the property of the vessel and was the same dunnage that had been removed from the vessel earlier in the day by the third-party defendant's employees and placed upon the pier.[2]

2. The stevedore did not employ an improper shipside method of operation in discharging the dunnage from the ship. "Shipside" means up until the time the dunnage was released from the ship's tackle onto the pier. (The interrogatory from which this finding stems was captioned "Unseaworthiness—Shipside method of operation.")

3. The shipowner was not negligent in failing to supply proper equipment to the stevedore or in failing to eliminate an improper shipside method of operation by the stevedore in connection with the discharge of the dunnage from the ship. (The interrogatory from which this finding results was captioned "Negligence—Shipside.")

4. The method of operation used by the stevedore in handling the dunnage on the pier after it left the ship's tackle was improper, i. e., negligent or unsafe, because the stevedore did not secure the dunnage or make it fast, and this improper method of operation was a proximate cause of the plaintiff's injury. (The interrogatory from which this finding emanates was captioned "Shoreside—Method of Operation.")

5. The shipowner was negligent in failing to eliminate the stevedore's improper method of handling the dunnage on the pier after it left the ship's tackle and this negligence was a proximate cause of the plaintiff's injury. (The interrogatory from which this finding stems was captioned "Negligence—Pierside.")

6. The driver of the chisel was not negligent, either in picking up too much dunnage on his forks or in his method of driving the chisel on the pier.

7. The plaintiff was not contributorily negligent.

8. The stevedore breached its warranty to the shipowner to perform its job in a reasonably safe, competent, and workmanlike manner, or it was negligent in the manner in which it performed its job.[3]

We did not submit to the jury the question of whether the dunnage was an appurtenance of the ship. The evidence was uncontradicted that the dunnage had been removed from the ship to facilitate cargo operations and that it was destined to return to the ship at the end of the day. Accordingly, we informed counsel that it was our ruling that the dunnage was and remained an appurtenance of the ship while it was on the pier. Nor was there any dispute about the fact that the dunnage was fit for its intended purpose until the time it left the ship's tackle when it landed on the pier. Until that time the dunnage was securely banded by the lumber bridles—indeed, plaintiff's witness Rutter testified that the dunnage was "tight and beautiful" when it left the ship. And

---

2. By this finding the jury rejected the shipowner's contention that the dunnage which injured the plaintiff had never been on the ship.

3. This finding would have required that the shipowner be granted indemnity had the verdict been molded for the plaintiff.

the jury found that there was no improper handling of the dunnage until after it was released from the ship's tackle on the pier.

As the special findings of the jury indicate, we could have molded the verdict in favor of the plaintiff on only two theories: first, that the improper pierside method of operation by the stevedore in handling the dunnage on the pier rendered the ship unseaworthy; and second, that the shipowner's negligent failure to eliminate the stevedore's improper pierside method of operation breached a duty of care owed by the shipowner to the plaintiff.[4] For the reasons expressed in this Opinion, the law does not sustain either of plaintiff's theories, and we will deny the plaintiff's motion to remold the verdict in his favor.

*II. Did the Stevedore's Improper Pierside Method of Operation Render the Ship Unseaworthy?*

█ Plaintiff's first claim against the shipowner is that this accident is governed by federal maritime law, which includes the shipowner's warranty of seaworthiness. That doctrine is in essence "that things about a ship, whether the hull, the decks, the machinery, the tools furnished, the stowage, or the cargo containers, must be reasonably fit for the purpose for which they are to be used." Gutierrez v. Waterman Steamship Corp., 373 U.S. 206, 213, 83 S.Ct. 1185, 1190, 10

L.Ed.2d 297 (1963). This warranty of seaworthiness runs to longshoremen engaged in cargo operations, as well as to seamen. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). By virtue of the Admiralty Extension Act of 1948, *supra,* maritime law governs not only accidents occurring on navigable waters, but also injuries "caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land."

█ However, maritime law, including the warranty of seaworthiness, does not apply to all accidents occurring during cargo operations. In Victory Carriers, Inc. v. Law, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971), the Supreme Court held that maritime law did not apply to an accident on the pier in which a longshoreman driving a cargo-laden forklift, owned by the stevedore, was injured by a defective protection rack on the forklift which came loose and fell on him. On the other hand, the *Victory Carriers* decision reaffirmed the Court's holding in Gutierrez v. Waterman Steamship Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963), that maritime law does apply when a longshoreman is injured on the pier by defective cargo containers, which are appurtenances of the ship, that were defective before they left the ship. The issue before us is whether this case is controlled by *Victory Carriers* or by *Gutierrez*. We have concluded that *Victory Carriers* controls.[5]

4. The jury's finding that there was no unseaworthy condition or any negligence respecting the shipside method of operation eliminated any possibility of molding a verdict for plaintiff on these aspects of the case. Thus, plaintiff's post trial argument that the failure of the shipowner to supply, and the stevedore to use, rope slings before the dunnage was lifted out of the hold rendered the ship unseaworthy is disposed of by the jury's findings of no negligence or unseaworthiness in the shipside methods of operation. We note too that this was purely a "method of operation" case; there was no contention by plaintiff of any unseaworthiness or negligence other than by an improper method of operation.

5. The notion of the "applicability of maritime law" has three distinct aspects. In our read-

ing of the caselaw we find various cases addressing different aspects of the notion without articulation. Accordingly, in the interest of clarity and precision of analysis, it will be helpful to discuss these three aspects and note which are before us here.

The first aspect is the issue whether the federal court has subject-matter jurisdiction, by virtue of the maritime nature of the case, under 28 U.S.C. § 1333. This is not an issue in the case at bar because our jurisdiction stems from 28 U.S.C. § 1332, diversity of citizenship. The second aspect is a choice-of-law question: whether the substantive principles applicable to the case are principles of state law or principles of maritime law, including both the warranty of seaworthiness and maritime negligence law. It is to these

As we have noted above, we are satisfied that the dunnage was an appurtenance of the ship, and remained so even after it was unloaded from the hold and stacked on the pier. In this respect the case before us is more akin to *Gutierrez* than to *Victory Carriers*. However, in *Gutierrez* the leaking cargo containers were defective and were leaking even before they were removed from the ship, and we regard this fact as crucial to the decision in that case. The dunnage here was not defective until after it left the ship's tackle, and then only because it was unbanded on the pier. It is not in the nature of dunnage to be banded while it is on the ship.[6] The plaintiff here has not cited to us, and we have been unable to find, a single case applying the law of the sea to a longshoreman injured while working on the pier by an appurtenance of the vessel which was removed from the vessel and which was wholly fit when removed but rendered unfit by the stevedore after it was placed on the pier and detached from the ship's tackle.

The most notable cases in the area, including those relied upon by the plaintiff, are all inapposite. In Hagans v. Ellerman & Bucknall Steamship Co., 318 F.2d 563 (3d Cir. 1963), the plaintiff was working in the pier shed unloading bags of sand from trucks onto which they had been placed by the ship's tackle, when he slipped on sand that had leaked onto the floor. Just as in *Gutierrez*, the evidence was that the sandbags were already leaking before they were removed from the ship's hold. In Thompson v. Calmar Steamship Corp., 331 F.2d 657 (3d Cir. 1964), cert. denied, 379 U.S. 913, 85 S.Ct. 259, 13 L.Ed.2d 184 (1964), the plaintiff was standing at the brake of a freight car containing cargo about to be loaded aboard the vessel. The ship's tackle was used to pull three other loaded cars into motion so that they would strike the plaintiff's car and thereby move it into proper position for loading. *Thompson* is thus distinguishable from the case at bar because the ship's tackle caused the injury while it was being improperly used. In Spann v. Lauritzen, 344 F.2d 204 (3d Cir. 1965), cert. denied, 382 U.S. 938, 86 S.Ct. 386, 15 L.Ed.2d 348 (1965), the plaintiff was injured by a defective piece of equipment owned by the stevedore and located on the pier but which was being used to unload the cargo from the ship. Our case is different because the dunnage was not being used as equipment in the direct unloading of the cargo.

Furthermore, we must be extremely careful in relying on pre-*Victory Carriers* precedents applying maritime law. *Victory Carriers* did not list which lower court decisions it approved and which it disapproved, but in 404 U.S. at 214, 92 S.Ct. 418, 30 L.Ed.2d 383 n. 14, the Court noted the presence of "substantial confusion in the lower courts" and ob-

---

two matters that the Extension of Admiralty Jurisdiction Act, 46 U.S.C. § 740, is relevant. The third aspect is the application of maritime law to the facts, *i. e.*, deciding whether under the facts the vessel was unseaworthy and whether the shipowner was negligent.

We have examined some of the cases discussed in this Opinion with reference to the classifications spelled out above. *Victory Carriers* dealt with the second question, the choice-of-law question. The last paragraph of Mr. Justice White's majority opinion indicated that a decision in that case that maritime law applied to the accident would not necessarily mean that the federal courts would have subject matter jurisdiction under § 1333, and suggests that it would be up to Congress to expand the admiralty subject-matter jurisdiction of the federal courts. *Gutierrez*, in the section of the opinion not dealing with negli-

gence, deals with the third issue, in two parts: first, whether the defective cargo containers (bean bags) made the ship unseaworthy, and second, whether the unseaworthiness principle allows recovery to a longshoreman working on the pier rather than on the vessel. The Court answered both questions affirmatively. It is the second aspect of the notion of maritime jurisdiction—the choice-of-law question dealt with in *Victory Carriers*—with which we are concerned in this section of the Opinion.

6. However, as noted above, the jury in its findings rejected both the plaintiff's attempt to bring the case within *Gutierrez* and the plaintiff's argument that the failure to band the dunnage while still on the ship was improper. This case might have had a different result had the plaintiff been injured, *e. g.*, by sharp nails protruding from the dunnage.

served that "the cases are impossible to rationalize." Spann v. Lauritzen, *supra,* is one of the cases cited as an example *Spann* is also cited with approval in the dissenting opinion, in which it is characterized as involving analogous facts to those in *Victory Carriers.* Accordingly, we think we are better advised to scrutinize *Victory Carriers* itself carefully for any teachings applicable to our case.

The Supreme Court's opinion approves the approach of "[r]eliance upon the gangplank line as the presumptive boundary of admiralty jurisdiction except for cases in which a ship's appurtenance causes damage ashore," 404 U.S. at 214 n. 14, 92 S.Ct. at 426. The Court examined the facts before it and found the absence of "the typical elements of a maritime cause of action": Was the plaintiff injured by "equipment that was part of the ship's usual gear or that was stored on board"; was the equipment that injured him attached to the ship; was the equipment under the control of the ship or its crew; and on which side of the gangplank did the accident occur? All of these typical elements were lacking in *Victory Carriers;* here we find only the first is present, and that only in attenuated fashion, since the dunnage was serving no function while it was being stored on the pier. The other elements are conspicuously absent.[7]

Furthermore, the Court specifically held that the fact that the plaintiff in *Victory Carriers* was engaged in a very general sense in the process of unloading the cargo, historically a seaman's task (and noted as such on this record by Captain Ash), did not automatically entitle him to the benefit of the unseaworthiness remedy. Instead, said the Court, where the injury takes place on the pier, such as in *Gutierrez,* the plaintiff can recover only if his injury is caused by an appurtenance of the ship

in such a way that the injury can be held to be an "injury, to the person . . . caused by a vessel on navigable water" within the language of the Extension Act. We cannot hold here, as plaintiff asks us to, that plaintiff's injury was "caused by a vessel on navigable water," since the dunnage was not on board or attached to the ship at the time; it was in seaworthy condition when it left the ship (the jury expressly so found) and until the time came for it to be moved from one place to another on the pier where the accident took place; and the ship's crew was in no way responsible for its handling after it left the ship's tackle. Thus for the reasons stated we conclude that *Victory Carriers* does not authorize recovery by the plaintiff in this case for unseaworthiness.

To afford the plaintiff here an unseaworthiness remedy, we would have to expand admiralty jurisdiction beyond the furthest point to which the Supreme Court has extended it, which is the *Gutierrez* case. For, as we have seen, the case before us lacks two elements present in *Gutierrez* which contributed to the link in that case with the maritime jurisdiction: the fact that the cargo containers were defective while still on board the ship, and the related fact that the shipowner had an opportunity to repair the cargo containers while they were still under his control. Plaintiff in essence asks us to hold that the maritime jurisdiction applies even without these two elements. This we are unwilling to do. Just last term, the Supreme Court, in Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), reiterating its approach in *Victory Carriers,* warned that "in determining whether to expand admiralty jurisdiction, 'we should proceed with caution . . . .'" We might add our own view that a district

---

7. Even though the location of the accident is one criterion for considering whether maritime law applies to the plaintiff's injury, it is not the sole criterion. In Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), the Court eschewed the strict situs-of-the-tort approach in favor of a more flexible analysis of the relationship of the accident to traditional maritime activity. This attitude is consistent with the philosophy of *Victory Carriers.*

judge asked to expand the scope of maritime jurisdiction might exercise more caution than the Supreme Court, one of whose functions is to shape the law.

In *Victory Carriers* the Court noted that its decision in no way contravened the policy of compensating longshoremen for injuries without proof of fault because of the hazards of their occupation. This was so because injured longshoremen were generally covered by state workmen's compensation laws. Even if the plaintiff recovered from the vessel owner, the latter would more often than not be entitled to indemnity under its contract with the stevedore, so that the burden of the loss in any event would fall on the stevedore. When the longshoreman sues the shipowner for unseaworthiness, as the Court observed, what is generally at issue is not whether the longshoreman will recover, and from whom, but just how much he will recover from his employer. The legislatures, the Court said, may wish to make better provision for compensation of injured longshoremen when they have no remedy against the shipowner, but the Court is limited by the Extension Act from expanding the scope of seaworthiness protection afforded longshoremen working on the pier.

■ In fact, Congress did turn its attention to the arguable inequity of the availability of a tort remedy to some injured longshoremen but not others. However, the legislative solution was not to further broaden the scope of the maritime jurisdiction; rather, Congress extended the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950, to cover pierside as well as shipside accidents, § 903, and made this statutory compensation the *exclusive* compensation available to longshoremen "if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel." §

905(b) *See* Act of Oct. 27, 1972, P.L. 92–576, 33 U.S.C. § 905(b). And see generally Lucas v. Brinknes Schiffahrts GES. Franz Lange G. m. b. h. & Co., K. G., 379 F.Supp. 759 (E.D.Pa., filed Aug. 5, 1974) (Huyett, J.). The 1972 amendments eliminate a longshoreman's cause of action against a vessel for unseaworthiness, although it permits him to sue for the negligence of the vessel. Thus, even in the case of accidents clearly within the maritime jurisdiction, longshoremen will not be able to sue the vessel for injuries resulting solely from the negligence of their fellow employees.[8] Consequently, had this plaintiff's accident occurred after November 26, 1972, the effective date of the amendments, he would be denied recovery on the jury's finding of no shipside negligence by the shipowner,[8a] regardless of whether the stevedore's actions made the ship unseaworthy under traditional maritime law. Moreover, the legislative history of the 1972 amendments as explicated at length in *Lucas, supra,* consistent with the thrust of *Victory Carriers,* reflects the congressional intention to place the primary duty to provide a safe place for a longshoreman to work upon the stevedore. Hence, our discussion in this opinion of this intellectually fascinating borderline situation, while of course having the utmost importance to Mr. Mascuilli, will have virtually no precedential effect.

Our research has uncovered only one case on all fours with this case, and it supports the result we reach. In Snydor v. Villain & Fassio et Compania Internazionale Di Genova Societa Reunite Di Naviagaione, S. P. A., 459 F.2d 365 (4th Cir. 1972), plaintiff Green was working in the pier shed spotting pallets of cargo unloaded from the ship. He was injured when a case of cargo fell from a stack of pallets, and he claimed that his injury was caused by defective cargo pallets, which were an appurtenance of the ship.

8. Under the Act prior to amendment, the common case before the judges of this Court was one in which the longshoreman's claim was based upon unseaworthiness and the ship had been rendered unseaworthy by actions of the stevedore's employees. Such a case no longer gives rise to liability of the vessel.

8a. We discuss the effect of the jury's finding of pierside negligence by the shipowner, *infra.*

However, at the trial he offered no evidence that the pallets were defective when they left the ship. Instead, the evidence tended to prove that the defect in the pallets resulted from the negligence of a forklift operator during the stacking of the pallets after they left the ship. The Court of Appeals affirmed denial of maritime recovery, holding that evidence that the pallets were defective when they left the ship would be "a fact crucial to establishing a maritime cause of action under the Admiralty Extension Act." 459 F.2d at 368. The Court thus distinguished *Gutierrez,* as we have done, on the ground that in *Gutierrez* the cargo containers were defective when they left the ship; where they did not become defective until later, and no personnel from the vessel made them defective, recovery must be denied.

This case is strikingly similar to *Snydor.* The dunnage was in proper condition when it left the ship, being adequately contained by the lumber bridles; there was no need for it to be banded while it sat in one place on the pier; only when the stevedore lifted the dunnage on the forks of the chisel to move it on the pier was there anything wrong with the condition of the dunnage, *i. e.,* it was unbanded and loose. We thus agree with the Fourth Circuit, the only court we have found that has ruled on this precise point. We also infer from a reading of *Gutierrez* the strongest implication that if the bean bags had not begun leaking until after they were landed on the pier, and it was the negligence of the longshoremen that caused them to leak, *e. g.,* handling the bags with sharp hooks to move them from the pier into the pier shed, then the case would have been decided the other way.

Garrett v. Gutzeit O/Y, 491 F.2d 228 (4th Cir. 1974), relied upon by plaintiffs, is inapposite. In *Garrett,* which is a case virtually on all fours with *Gutierrez,* a longshoreman was injured when some wire bands used to compress bales of pulp paper which had been discharged from the vessel broke under the stress of a hand hook while the dock gang was jumping a bale up to the fourth tier of a stack. The accident occurred $3\frac{1}{2}$ hours after the work started during which time numerous bands on the cargo had been breaking. The evidence was that the bands broke because of the way the bales had been wedged in the hold of the ship; that shifting weight during the voyage and the strain of the wedged bales had caused breakage; and that the ship's crew was on duty during the unloading and had observed the defective condition of many of the bands for over three hours. Thus, unlike the present case, the appurtenance causing the accident was defective prior to leaving the ship. In a footnote, the *Garrett* court cites *Gutierrez* as "establish[ing] that jurisdiction existed on the dock *if the shipowner discharged defective cargo containers.*" *Id.* at 233 n. 8 (emphasis added). And the court reaffirmed the holding of *Snydor, supra,* that "[a] fact crucial to establishing a maritime cause of action under the Admiralty Extension Act is that the cargo containers were defective when they left the ship." *Id.* n. 9.

In sum, the jury's finding of an improper pierside method of operation by the stevedore does not aid plaintiff's case. Under the facts of this case and the applicable law, plaintiff has no maritime cause of action under the Admiralty Extension Act; hence the verdict was properly molded for the shipowner on the issue of unseaworthiness.[9]

We also believe, however, that even if the warranty of seaworthiness applies in this case, that the improper pierside method of operation by the stevedore did not render the ship unseaworthy. We have little doubt that im-

---

9. Plaintiff has not argued that there is an unseaworthiness doctrine in Pennsylvania law which would be applied even though federal maritime law is not. Nor are we aware of any such doctrine. *See* Cooper v. Australian Coastal Shipping Comm'n, 338 F.Supp. 1056 (E.D.Pa.1972), aff'd mem., 474 F.2d 1340 (3d Cir. 1973) ; McNeil v. A/S Havbor, 339 F.Supp. 1264 (E.D.Pa.1972).

proper method of operation by the stevedore's employees on board the ship or on the pier while using the ship's tackle renders the ship unseaworthy, see, e. g., Ferrante v. Swedish American Lines, 331 F.2d 571 (3d Cir. 1964), petition for cert. dismissed, 379 U.S. 801, 85 S.Ct. 10, 13 L.Ed.2d 20 (1964); Scott v. Isbrandtsen Co., 327 F.2d 113 (4th Cir. 1964), as long as the improper method of operation is not merely instantaneous, Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971). However, we have found no authority suggesting that an improper pierside method of operation by the stevedore when the ship's tackle is not being used and the cargo is not being moved onto or off of the ship renders the ship unseaworthy, even though the stevedore is generally engaged in the process of loading or unloading. Therefore, we would address the third aspect of maritime jurisdiction referred to in note 5, supra, with the conclusion that the improper pierside method of operation specially found by the jury did not render the vessel unseaworthy as a matter of law, and accordingly, unseaworthiness recovery by the plaintiff must be denied on this additional ground.

### III. Did the Shipowner's Negligence as Found by the Jury Breach a Duty to the Plaintiff?

■ Plaintiff's second claim for the molding of the verdict in his favor stems from the jury's findings that the shipowner was negligent in failing to eliminate the stevedore's improper method of handling the dunnage on the pier after it left the ship's tackle and that this negligence was a proximate cause of the plaintiff's injury. These findings frame the plaintiff's contention that, even if he cannot recover on the basis of the vessel's unseaworthiness, he is entitled, by

reason of the jury's finding, to recover on the basis of negligence. Negligence, he reminds us, is a separate and distinct doctrine from that of unseaworthiness. See Earles v. Union Barge Line, 486 F.2d 1097 (3d Cir. 1973).

The maritime law includes a negligence principle embodying the standard of reasonable care, see Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 630, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959).[10] Moreover, Victory Carriers dealt only with the doctrine of unseaworthiness; negligence was not at issue. However, we do not see that as a distinction with a meaningful difference. In view of the reasoning of Victory Carriers, we believe that the Court would have held that there was no federal maritime jurisdiction in the choice of law sense (see n. 5 supra) over a negligence claim by plaintiff.

The foregoing conclusion does not of course end our inquiry, for the case is here under the diversity jurisdiction where plaintiff might be entitled to recover on the ground of state negligence law (although he asserted no such claim at trial). The maritime law of negligence may well be broader than that embodied in the law of Pennsylvania, which would be applicable if state law applies. However, under either Pennsylvania law or maritime law, the defendant is not liable to the plaintiff if the accident did not result from defendant's breach of a duty of care owed to the plaintiff. And under the facts of this case, there is no evidence of a duty of care owed by the shipowner to the plaintiff or of a breach thereof if any such duty existed. Further, the jury's finding that the shipowner was negligent in failing to eliminate the stevedore's improper method of handling the dunnage on the pier after it left the ship's tackle is devoid of even minimal evidentiary support which would enable us to mold a verdict for the plaintiff.[11]

---

10. Plaintiff is not a merchant seaman, hence the Jones Act, 46 U.S.C. § 688 (1970), does not apply.

11. Our view on this point has not changed since the time of the trial. We submitted the

issue of pierside negligence to the jury only to avoid the necessity of a retrial in the event that we did change our view upon the further reflection that we knew we could afford on post trial motions. A similar course

The principal question in this area is whether the shipowner had a duty to the plaintiff to see that the dunnage was not transported from one spot on the pier to another without having first been banded. As we understand Pennsylvania law (and also maritime law), the defendant shipowner had no duty to use reasonable care to see that the method of operation employed on the pier after the cargo left the ship's tackle was safe and proper. To say that cargo operations are traditional duties of seamen, that is, shipowner's employees, *see* Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), is not necessarily to conclude that even when the cargo operations are delegated to an independent contractor (the stevedore), as they were here, the shipowner retains supervision and control of the entire operation. It is true that the shipowner remains in control of the ship and cannot delegate his duty to provide longshoremen with a reasonably safe place to work while they are on the ship, *see* Beard v. Ellerman Lines, Ltd., 289 F.2d 201 (3d Cir. 1961). But it is equally true that the shipowner has no control of the pier and correspondingly no duty, for instance, to repair or warn against the presence of holes in the pier floor. *Cf.* McNeil v. A/S Havbor, 339 F.Supp. 1264 (E.D.Pa. 1972). And while there was a broad opinion by Captain Ash as to the generalized role of the master of the vessel in connection with cargo operations, there was no evidence here of control or right of control in the ship or even evidence from which an inference of control could be drawn such as would justify a verdict under state law. *Cf.* Spinozzi v. E. J. Lavino & Co., 243 F.2d 80 (3d Cir. 1957).

On this record it appears that the longshoremen were employees of the stevedore only and they took their orders from the stevedore only, not from the ship's officers. The shipowner's supervision over the method of cargo operations extended beyond the gangplank onto the pier only to the extent that appurtenances of the ship, such as winches and booms and cables, were used to move cargo between the pier and the ship. Operations strictly on the pier, involving use of the stevedore's equipment only, were not subject to control by the shipowner. The courts have recognized that a duty of care does not always arise whenever ship's officers are present to observe and inspect operations by a contractor. *See* West v. United States, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959); Bryant v. National Transport Corp., 467 F.2d 139 (3d Cir. 1972) ("the evidence would not support a finding that the shipowner had retained possession or control of the area or the activity in which the accident occurred"); McGrath v. N. V. Reederin "Nautiek", Civ. No. 70–3361 (E.D.Pa. Dec. 30, 1971) (shipowner had no control over unloading of cargo from boxcar on pier); Cooper v. Australian Coastal Shipping Comm'n, 338 F.Supp. 1056 (E.D.Pa.1972), aff'd mem., 474 F.2d 1340 (3d Cir. 1973) (shipowner had no control over cargo movements on the pier). This is so even though the dunnage being moved on the pier by the stevedore was the property of the shipowner; the shipowner had no more duty to supervise the method of moving its property along the pier than it would, under the cases just cited, to supervise the method of moving cargo, which is entrusted to it as a carrier along the pier.

Since we hold that on this record and as a matter of law the shipowner had no duty to control the manner in which the stevedore operated on the pier after the ship's tackle was no longer involved, we cannot mold the jury's special finding of negligence into a verdict for the plaintiff. This holding is buttressed by analogy to the keystone of the plaintiff's case—*Gutierrez*. In *Gutierrez*, the Supreme Court held that the shipowner was negligent in permitting the discharge of defective bean bags, even though the impact of that negligence, *i. e.*, the acci-

---

was followed by our colleague Judge Higginbotham in The Venzie Corporation v. United States Mineral Products Company, Inc., 382 F.Supp. 939 (E.D.Pa., filed July 7, 1974).

dent which occurred on the pier, was felt only in a place the shipowner did not control. That teaching is inapposite here because of the same factual distinction that has persuaded us that *Gutierrez* does not control disposition of our unseaworthiness issue. The bean bags were defective and leaking while they were on the ship in *Gutierrez;* the shipowner had control of them at that time and should have known of their condition and repaired them then. In our case, however, the jury found that the dunnage was removed from the ship in a proper manner, and that only the pierside method of operation by the stevedore was improper. As we have noted, the evidence did not show that the shipowner had the power to direct the manner in which the longshoremen working on the pier and not using the ship's tackle performed their duties. Thus, while the nondelegable duty of care referred to in *Gutierrez* was a duty "not to create this risk" to the plaintiff, the evidence before us is clear that the shipowner did not "create the risk" to the plaintiff here. The risk was created only by the stevedore's employees, and the question we are deciding is whether the shipowner had a duty to prevent them from creating that risk; we hold that it did not.

The conclusion which we reach is further buttressed by a consideration of the legislative history of the 1972 amendments, for as noted in the *Lucas* opinion, *supra,* it was the clear intention of Congress to place the primary duty to provide a safe place for a longshoreman to work upon the stevedore. And, just as was the case of our analysis of the plaintiff's unseaworthiness claim, we feel constrained to observe that the 1972 amendments virtually emasculate the precedential effect of this decision. Finally, we note that the plaintiff has cited to us

no cases holding a shipowner liable for negligent failure to eliminate an improper pierside method of operation by the stevedore not involving use of the ship's tackle. We have been unable to find any such cases ourselves. In sum, we hold that in the circumstances of this case, the defendant shipowner has breached no duty to exercise care to eliminate the improper method of operation employed by the third-party defendant stevedore in moving the dunnage along the pier without first securing it.[12]

### IV. *Conclusion*

For the reasons stated, we will deny the plaintiff's motion to remold the verdict in his favor, or in the alternative, to grant a new trial.

### APPENDIX

### SPECIAL INTERROGATORIES TO THE JURY*

I. *Ownership of the Dunnage*

Was the dunnage which fell from the chisel striking the plaintiff the property of the shipowner which had been removed from the ship earlier that day and placed on the pier by the employees of the stevedore?

|   Yes   |      |
| --- | --- |
| Yes | No |

II. *Unseaworthiness*

  A. *Shipside*

    1. *Method of Operation*

Was the method of operation used by the stevedore in discharging dunnage from the vessel between 8:00 a. m. and 9:00 a. m. on July 8, 1970 improper (i. e., negligent or unsafe)? (in answering this interrogatory you are to consider the method of operation used up until the time the dunnage was released from the ship's tackle onto the pier).

|      |   No   |
| --- | --- |
| Yes | No |

---

12. We have already noted that the plaintiff's theory of the shipowner's negligence in failing to supply or require the use of rope slings before the dunnage left the hold was rejected by the jury in their answers to the special interrogatories.

* *Note to Jurors:* If the answer to an interrogatory is, by a fair preponderance of the evidence, "yes", then you should check the box marked "yes"; otherwise you should check the box marked "no". Your verdict as to each interrogatory must be unanimous.

## 2. *Proximate Cause*

If the answer to the foregoing interrogatory is yes, was the improper method of operation a proximate cause of the injury to plaintiff? 

          No
<br>Yes     No

### B. *Shoreside*

#### 1. *Method of Operation*

(a) Was the method of operation used by the stevedore in handling the dunnage on the pier after it left the ship's tackle on July 8, 1970 improper (i. e., negligent or unsafe) because the stevedore did not secure the dunnage or make it fast?

    Yes
<br>Yes    No

(b) If the answer to the foregoing interrogatory is "yes," was the improper method of operation a proximate cause of the injury to plaintiff? Yes
<br>Yes    No

#### 2. *The Chisel*

(a) Did Mr. Grogans pick up too much dunnage on his forks? 

         No
<br>Yes    No

(b) If the answer to the foregoing interrogatory is "yes," was that fact a proximate cause of the injury to plaintiff?

         No
<br>Yes    No

(c) Did Mr. Grogans drive the chisel negligently?

         No
<br>Yes    No

(d) If the answer to the foregoing interrogatory is "yes," was Mr. Grogans' negligent driving of the chisel a proximate cause of the injury to plaintiff?

         No
<br>Yes    No

## III. *Negligence*

### A. *Shipside*

1. Was the shipowner negligent in failing to supply proper equipment to the stevedore or in failing to eliminate an improper shipside method of operation by the stevedore in connection with the discharge of dunnage from the vessel between 8:00 a. m. and 9:00 a. m. on July 8, 1970? (In answering this interrogatory, you are to consider the method of operation used up until the time the dunnage was released from the ship's tackle onto the pier)

         No
<br>Yes    No

### 2. *Proximate Cause*

If the answer to the foregoing interrogatory is "yes," was the negligence of the shipowner a proximate cause of the injury to plaintiff?

         No
<br>Yes    No

### B. *Pierside*

1. Was the shipowner negligent in failing to eliminate an improper pierside method of operation by the stevedore in connection with the handling of dunnage on the pier after it left the ship's tackle?

    Yes
<br>Yes    No

### 2. *Proximate Cause*

If the answer to the foregoing interrogatory is "yes," was the negligence of the shipowner a proximate cause of the injury to plaintiff? Yes
<br>Yes    No

## IV. *Contributory negligence*

### A. *Acts or Omissions*

Was the plaintiff guilty of any negligence which contributed to his accident?

         No
<br>Yes    No

### B. *Proximate Cause*

If the answer to the foregoing interrogatory is "yes," was plaintiff's contributory negligence a proximate cause of his injuries?

         No
<br>Yes    No

### C. *Percentage*

If the answer to the foregoing interrogatory is "yes," to what extent, expressed in percentage, did plaintiff's negligence contribute to his injuries?

    0%

## V. *Third Party Action*

### A. *Breach of Warranty or Negligence*

Did the stevedore breach its warranty to perform its job in a reasonably safe,

competent and workmanlike manner, or was it negligent in the manner in which it performed its job?   Yes _____

Yes       No

B. *Proximate Cause*

If the answer to the foregoing interrogatory is "yes," was the negligence of the shipowner a proximate cause of the injury to plaintiff?   Yes _____

Yes       No