Francis KINSELLA,
Plaintiff-Appellant,

v.

ZIM ISRAEL NAVIGATION CO.,
LTD., Defendant-Appellee.

No. 74–1234.

United States Court of Appeals
First Circuit.

Argued Dec. 2, 1974.

Decided March 27, 1975.

Michael B. Latti, Boston, Mass., with whom Kaplan, Latti & Flannery, Boston, Mass., was on brief, for plaintiff-appellant.

Thomas D. Burns, Boston, Mass., with whom Burns, & Levinson, Boston, Mass., were on brief for defendant-appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

Plaintiff Kinsella commenced this action under the general maritime law to recover for his injuries allegedly caused by the unseaworthiness of the S.S. NEGBA and the negligence of its owner, Zim Israel Navigation Co., Ltd.[1] When plaintiff closed his case, defendant moved for

---

1. There was no allegation that diversity of citizenship existed or that there was a basis for federal jurisdiction other than that in admiralty.

The ship also brought a third-party action against the stevedore, but prior to trial that action was dismissed by stipulation and the stevedore assumed defense of this case on behalf of the ship.

a directed verdict, which the court granted after oral argument. Plaintiff claims he presented a prima facie case, and for purposes of this appeal we accept as true the facts helpful to plaintiff which are fairly supported by the evidence presented, and draw all reasonable favorable inferences.

On July 19, 1970, Kinsella, a 56-year-old longshoreman with 25 to 30 years' experience, was working as a member of a longshoring gang on the pier at the Boston Army Base. He was working on shore as a lander 15 to 20 feet from the ship. A lander guides the cargo as it comes off the ship and removes it from the hook. The unloading began at approximately 8:30 a. m. with the discharging of three or four bundles of the plywood, known as dunnage, which is used to separate cargo in the hold. Each bundle contained approximately 30 pieces of plywood, which were broken, cracked, and splintered. Part of this dunnage was removed to a shed by the forklift. When plaintiff returned from getting some gear for the gang, he observed that nine pieces of this plywood had been laid in sheets over the railroad tracks that run between the ship and the shed. The purpose of laying the plywood over the tracks was to enable the forklift to cross the tracks without upsetting its cargo. Normally the stevedore supplies steel plates for this purpose.

Plaintiff and his gang discharged general cargo all day in spite of having no steel plates and having observed the broken and warped condition of the plywood substitute. Twice that day, once in the morning and once in the afternoon, plaintiff and his partner asked the stevedore boss for steel plates, but they were told that none were available. As the plywood was crossed and recrossed by the forklift, it became even more broken, chipped, and cracked, though there was evidence that the portion where plaintiff tripped was not traversed by the forklift. At about 4 p. m. plaintiff was approaching a load and watching it descend when he caught his foot on a piece of plywood, tripped, and landed on his elbow, suffering the injuries which led to this suit.

Although the issue is not entirely without doubt,[2] it appears that the district court's judgment for defendant was predicated on a finding that it lacked jurisdiction.[3] The judgment docketed in the case indicates that the complaint was dismissed, which would be the disposition called for by Fed.R.Civ.P. 12(h)(3) if jurisdiction was found to be wanting. In any event, we see the jurisdictional issue as both the beginning and the end of our inquiry.

If there is federal jurisdiction, it must be founded upon the Admiralty Extension Act, 46 U.S.C. § 740, which provides in relevant part:

"The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused

---

**2.** For example, the judge stated at one point: "[A]s presently advised it is my view that as a matter of law there just isn't unseaworthiness liability on the part of this owner." Later in the argument he stated: "[I]t would seem to me that no reasonable trier of fact could conclude that there was negligence in putting ashore that stuff, and I can't see how the mate could be expected to foresee that these people would use that to run their [forklift] over. . . ." Moreover, the judgment recited that the court had allowed defendant's motion for a directed verdict.

**3.** Near the very end of this case, the transcript shows the following discourse after the court announced its intention to direct a verdict for defendant:

"MR. LATTI [plaintiff's counsel]: May I ask the Court whether or not the Court in its statement here for the record—did the Court find admiralty jurisdiction or is the Court directing on the basis of lack of jurisdiction?

THE COURT: A lack of jurisdiction.

MR. LATTI: Lack of jurisdiction?

THE COURT: Yes.

MR. LATTI: With respect to both counts, your Honor?

THE COURT: Yes. I understand that admiralty jurisdiction is required in order to prevail on both counts.

MR. LATTI: Yes, it is, your Honor, the way it is pleaded in the complaint.

THE COURT: Yes."

by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land."

Thus the issue here is whether an injury caused by the plywood dunnage is an injury "caused by a vessel" on navigable water. It might at first appear that this case is controlled by Gutierrez v. Waterman Steamship Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963), where a longshoreman had slipped on some loose beans spilled on the dock from broken and defective bags being unloaded from a ship. The Supreme Court's words swept broadly:

"We think it sufficient for the needs of this occasion to hold that the case is within the maritime jurisdiction under 46 U.S.C. § 740 when, as here, it is alleged that the shipowner commits a tort while or before the ship is being unloaded, and the impact of which is felt ashore at a time and place not remote from the wrongful act." 373 U.S. at 210, 83 S.Ct. 1188 (footnote omitted).

The Court's later decision in Victory Carriers, Inc. v. Law, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971), headed off whatever inclination lower courts might have had to read Gutierrez in as unbounded a manner as the passage quoted above, taken literally, might have sanctioned. In Victory Carriers the plaintiff longshoreman was injured by a defective forklift he was operating on the dock. The forklift was owned by the stevedoring company and was not a part of the ship's gear. In ruling that there was no admiralty jurisdiction, the Court stated:

"The decision in Gutierrez . . . turned, not on the 'function' the steve-

dore was performing at the time of his injury, but, rather, upon the fact that his injury was caused by an appurtenance of a ship, the defective cargo containers . . . The Court has never approved an unseaworthiness recovery for an injury sustained on land merely because the injured longshoreman was engaged in the process of 'loading' or 'unloading.' . . .

"In the present case . . . the typical elements of a maritime cause of action are particularly attenuated: . . . Law was not injured by equipment that was part of the ship's usual gear or that was stored on board, the equipment that injured him was in no way attached to the ship, the forklift was not under the control of the ship or its crew, and the accident did not occur aboard ship or on the gangplank. . . ." 404 U.S. at 210–11, 213–14, 92 S.Ct. at 424.

The determinative issue in this case, then, is whether the facts depart sufficiently from the situation in Victory Carriers to warrant a contrary result.[4] The only important factual difference would appear to be that the dunnage was part of the ship's usual gear and was stored on board when the ship was at sea.[5] Although it is necessary to direct some attention to the issue of whether the dunnage was an appurtenance of the ship, and if so when and for what purposes, that label when used as a surrogate for a finding of jurisdiction may yield more confusion than elucidation. While it has been said that jurisdiction in admiralty "extends to shore-based workers who are injured by an appurtenance of the ship at a time and place not remote from the wrongful act

---

4. *Victory Carriers* did not, as a technical matter, deal with the reach of federal subject-matter jurisdiction in admiralty, since in that case diversity of citizenship provided an alternative basis for jurisdiction. But the choice-of-law question which was resolved there—whether the substantive principles applicable were those of maritime or state law—necessarily implicates the jurisdictional issue presented here, since jurisdiction under 28 U.S.C. § 1333 is certainly no broader than the area in which maritime principles are properly applied. *Vic-*

*tory Carriers, supra,* 404 U.S. at 216, 92 S.Ct. 418; Mascuilli v. American Export Isbrandtsen Lines, Inc., 381 F.Supp. 770, 773–74 n. 5 (E.D. Pa.1974).

5. There was evidence that the dunnage was loaded back onto the ship before it departed the port, though there was no evidence as to what happened to the specific sheets of plywood used to cover the railroad tracks. "Dunnage used on a ship is the property of a shipowner." *Mascuilli, supra* n. 4, at 771.

of the shipowner", Garrett v. Gutzeit O/Y, 491 F.2d 228, 232 (4th Cir. 1974), we find the bold simplicity of this formulation to be misleading. One important refinement which must be added is the recognition that not every item which is owned by a ship is necessarily an appurtenance for all purposes. The suggestion in Miller v. A/B Svenska Amerika Linien, 454 F.2d 1094 (3d Cir. 1971), that an item may variously be and not be an appurtenance provides a useful analogy. In that case, a leak was discovered in a bucket of water brought aboard the ship by longshoremen to slake their thirst, and the bucket was consequently removed from the ship and placed out of use on the pier. The plaintiff longshoreman slipped in the resulting puddle. The court rejected the argument that the leaky bucket was an appurtenance of the ship which rendered it unseaworthy, stating that even if it had been an appurtenance for a time it had lost that character when removed both from the ship and from use by the men who were unloading the cargo. "The question in such cases is *not* where the bucket was stored or who owned it but, as the court in *Miller* correctly discerned, whether the bucket had ever become an appurtenance of the vessel and, if it had, whether 'it had lost that character before the harm causing leakage occurred.' " ·7A Moore's Federal Practice ¶ .325 at 108 (1973 Supp.)

▆ Although the dunnage which allegedly caused the injury to plaintiff was undeniably owned by the ship and was an appurtenance at some times and for some purposes, it was not an appurtenance in relation to plaintiff's injury. The dunnage, which was not at the time being used for its usual functions in the hold, was removed solely to get it out of the way so that unloading of cargo could proceed more conveniently. Certainly if it had been bundled up improperly and had fallen on a longshoreman while being removed from the ship through the use of its crane, admiralty jurisdiction could properly be invoked. Perhaps jurisdiction would lie even after the bundles were set on the dock in an unsafe location if the injury resulted thereby. But the dunnage was appurtenant to the ship only with regard to its off-loading and storage, since its relationship to the ship during the period that it was ashore did not extend to any purpose or function beyond the clearing of the hold. There was no evidence to suggest that the ship had any reason to expect that the dunnage would be used in any way while it was on land, much less that it would be used in a manner so radically at variance with the usual practices regarding dunnage.[6] Most of the dunnage was apparently removed to a shed during the unloading operation, and the fortuity that some of the plywood which belonged to the ship was taken by the dockside workers and put to use is insufficient to bring about a result different from that which would be reached if all of the ship's dunnage had been removed and other plywood brought out for use over the railroad tracks.

The only case which we have discovered which closely parallels this one on its facts strongly supports our conclusion, although the analytical path followed is somewhat different. In Mascuilli v. American Export Isbrandtsen Lines, Inc., 381 F.Supp. 770 (E.D.Pa.1974), a load of dunnage had been removed from the ship and left unbanded on the pier. Later in the day it became necessary to

**6.** We assign no significance to the fact that evidence was introduced to show that dunnage is sometimes used in a ship's hold to provide a platform on which a forklift may operate. There is so little similarity between that use and the use of the plywood sheets to cover the rails that the relationship cannot be said to rise above the coincidence that in each case a forklift would drive over the dunnage. In the hold, the dunnage forms a temporary working platform when no other alternative is readily available. On the dock, however, steel plates are usually used to cover tracks and provide an operating surface able to withstand the abuse of continued forklift traffic. Because the dunnage here was used in a way so distinctly out of the ordinary, we need not decide what difference it would make if a piece of ship's equipment had been put to a "usual" though unanticipated and unauthorized use by shoreside personnel.

move some of the dunnage to another place on the pier, and while that was being done some of the pieces which were being moved by a forklift fell off and injured the plaintiff longshoreman. At first glance it appears that the court took an approach irreconcilable with that taken here, since it ruled that "the dunnage was and remained an appurtenance of the ship while it was on the pier." *Id.* at 772. In that case, however, while noting that, as here, only the first of the four factors listed by the *Victory Carriers* Court—the dunnage was part of the ship's usual gear and was stored on board—was present, the court indicated that even that factor was present "only in attenuated fashion, since the dunnage was serving no fuction while it was being stored on the pier." *Id.* at 775. On the ultimate issue[7] the court ruled against the plaintiff, differing from the approach set out above only in its characterization of the relevant facts as going more to causation than to the continuance of appurtenance status:

> "The plaintiff here has not cited to us, and we have been unable to find, a single case applying the law of the sea to a longshoreman injured while working on the pier by an appurtenance of the vessel which was removed but rendered unfit by the stevedore after it was placed on the pier and detached from the ship's tackle.

> "The dunnage was in proper condition when it left the ship, being adequately contained by the lumber bridles; there was no need for it to be banded while it sat in one place on the pier; only when the stevedore lifted the dunnage on the forks of the chisel to move it on the pier was there anything wrong with the condition of the dunnage, *i. e.*, it was unbanded and loose." 381 F.Supp. at 774, 777.

*See also* Snydor v. Villain & Fassio et Compania Internazionale, 459 F.2d 365 (4th Cir. 1972). If anything, the case presented for jurisdiction in *Mascuilli* was a stronger one than that before the court in this controversy. One would not have to adopt a very expansive notion of the function which the dunnage performed in relation to the ship in order to find that it was an appurtenance so far as its storage on the docks was concerned, including the possibility that it would need to be moved. In the case at bar the injury was less closely related to the function of dunnage, since there has been no suggestion that improper packaging, storage or movement of the dunnage, risks which the ship might well have to accept as an unavoidable side-effect of off-loading, was in any way involved in the injury. A finding of admiralty jurisdiction on the facts presented here would fly in the face of *Victory Carriers* by acknowledging admiralty jurisdiction whenever an object owned by a ship is in any way involved in events leading to an injury. None of the other *Victory Carriers* factors was present,[8] and this ship's property did not remain an appurtenance, when unloaded, with regard to functions other than its transfer and storage.

■ Since the dunnage was not an appurtenance for purposes of the plaintiff's injury, the district court properly ruled for defendant on both the unseaworthiness and negligence counts. The negligence claim could properly go to the jury only if federal subject-matter jurisdiction in admiralty existed, and our resolution of the "appurtenance" issue is therefore fatal to plaintiff even though that issue would not have borne upon the substance of the negligence count. *See Mascuilli, supra*, 381 F.Supp. at 778.

Affirmed.

---

7. Since diversity existed, the particular issue ruled on was whether maritime law should be applied, *see* n. 4 *supra*, not the existence of subject-matter jurisdiction in admiralty.

8. The only evidence even possibly bearing on the other factors was the statement that an officer of the ship appeared now and then near the railing on the shore side of the ship as it was being unloaded. Plaintiff does not suggest, and on this record could not establish, that the unloading operation was under the control of the ship rather than that of the stevedore.