George **GARRETT**, Appellant,

v.

Enso **GUTZEIT O/Y**, Appellee.

No. 73–1468.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 6, 1973.

Decided Feb. 8, 1974.

**230**

Sidney H. Kelsey, Norfolk, Va. (Kelsey & Kelsey, Norfolk, Va., on brief), for appellant.

Charles F. Tucker, Norfolk, Va. (Vandeventer, Black, Meredith & Martin, Norfolk, Va., on brief), for appellee.

Before CLARK, Associate Justice,* BOREMAN, Senior Circuit Judge, and BUTZNER, Circuit Judge.

BOREMAN, Senior Circuit Judge:

On January 7, 1971, the SS FINN-CLIPPER, a vessel owned and operated by Enso Gutzeit O/Y (shipowner), was berthed at Chesapeake & Ohio Railroad's Pier B, Newport News, Virginia, preparing to discharge a cargo of bales of pulp paper. Tidewater Stevedoring Corporation (Tidewater) had been employed by shipowner as an expert stevedore to unload the cargo.[1] The plaintiff, George Garrett, a longshoreman, was a member of the gang employed by Tidewater in connection with the discharge of the cargo of pulp paper.

At 8:00 A.M. the longshoremen began unloading the cargo. As is customary in the stevedoring industry the gang was divided into functional work groups; some were ordered to work on the ship while various duties were assigned to others on the pier. Garrett and others were to stack the cargo as it was delivered to them by other members of the "dock gang" in a storage shed located on the pier.

The cargo consisted of bales of pulp paper measuring approximately 2½ feet by 2½ feet by 1½ feet and weighing approximately three to five hundred pounds. Each bale was compressed and held together by four wire bands, "two of which were wound in each direction" as found by the district court, Garrett v. Gutzeit O/Y, 352 F.Supp. 1257, 1259 (E.D.Va.1973). The cargo was removed from the ship in the customary manner.[2] Once the cargo was removed from the ship's hold and placed on the dock the bales would be disconnected from the ship's gear. Members of the "dock gang" then moved the bales one at a time via hand trucks into a shed on the pier some twenty-five or more feet from the side of the ship. Garrett's work gang was instructed to stack the bales four high as they arrived in the shed. The cargo was transferred from the pier apron and stacked in the shed to facilitate the removal of more bales from the hold.[3]

Tidewater's superintendent Powell ordered Garrett and the others on the dock to use longshore hand hooks to handle the bales. They were instructed to place the hooks under the junction of two bands and thus lift the bales. Garrett and others in his work gang were attempting to jump a bale up to the fourth tier of a stack. At least one (two as found by the court) of the four bands on this particular bale was missing. The men inserted their hooks under the remaining bands and lifted the bale from the floor. Under stress one of the remaining bands broke, causing the

---

* Supreme Court of the United States, retired, sitting by designation.

1. Under the terms of a standing contract between Tidewater and the shipowner Tidewater was to remove the cargo from the ship and stack it in a shed on the pier.

2. The normal method employed in Newport News for the removal of such cargo was described by stevedore superintendent Powell. A stationary winch on the ship lowered sixteen to twenty hooks on rope halyards into the hold. Longshoremen connected two hooks to each bale. The hooks would be inserted under the wire at the junction of two bands. The winch then lifted eight to ten bales from the hold and lowered them over the side, onto the dock.

3. It is shown by the record that the cargo had to be removed from the side of the ship so that more bales could be deposited on the dock. This necessitated a continuous unloading process from the ship's hold to the stacking area.

bale to fall on Garrett who thus sustained a severe back injury.

The accident occurred at approximately 11:30 A.M., some 3½ hours after work started. During the 3½ hours of unloading, bands on the cargo had been breaking. Some bands were breaking before the bales could be lifted from the hold while others broke during discharge, permitting several bales to fall to the pier. Superintendent Powell testified that bands broke because of the way the bales had been wedged in the hold of the ship; that shifting weight during the voyage and the strain of removing the wedged bales had caused breakage; that the ship's crew was on duty during the unloading and had observed the defective condition of many of the bands.

Garrett brought this action against the shipowner, claiming that his injuries were caused by both the unseaworthiness of the vessel and the negligence of the ship's crew. The shipowner denied these allegations and impleaded Tidewater, claiming indemnity. The issue of unseaworthiness was submitted to the jury; the judge did not submit the negligence issue, stating that the shipowner owed no duty to Garrett. The jury returned a verdict of $45,000 for Garrett. The shipowner then moved to set aside the verdict and enter judgment in its favor.

In ruling on the shipowner's motion, the judge relied upon the basic premise that, in order to recover on an unseaworthiness theory, Garrett had to establish that he was engaged in work traditionally performed by a seaman. He refused to rule *as a matter of law* under the facts of the case that Garrett was engaged in such traditional work and concluded that this question should not have been submitted to the jury since the record was devoid of sufficient evidence upon which reasonable men could evaluate the nature of Garrett's work. Therefore, the court granted the shipowner's motion, set aside the verdict and entered judgment for shipowner. On appeal Garrett contends that the court erred in setting aside the verdict and in refusing to submit the negligence issue to the jury.[4]

I

■ The district judge denominated jurisdiction as the threshold issue, analyzed the subject in some detail, and concluded that, under the facts here, admiralty jurisdiction did exist. Although we agree with his conclusion on this point and most of his analysis we think it appropriate to further re-examine and review the subject of admiralty jurisdiction. There appears to be no little confusion concerning restrictions upon the right to recover under maritime law. This confusion is attributable, in great measure, to the fact that the scope of admiralty jurisdiction is not always equal to the breadth of the seaworthiness warranty.[5] Thus careful consideration of the limits of admiralty jurisdiction is essential and these limits must be applied solely to the jurisdictional issue; any attempt to apply analogous restrictions upon the scope of warranty coverage could easily lead to error.

■ ■ Admiralty jurisdiction may exist where a shore-based injury is involved, but, if so, it must be predicated on the Admiralty Extension Act. 46 U.S.C. § 740. In pertinent part the Act provides that:

"The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of dam-

---

4. We express no opinion as to the merits of Garrett's contention that the court erred in refusing to submit the negligence issue to the jury. Consideration thereof is unnecessary in view of our ultimate decision.

5. For example, an individual plaintiff may come within admiralty jurisdiction but without the protective scope of the seaworthiness warranty. *See* United Pilots Ass'n v. Halecki, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed. 2d 541 (1959). The reverse can also be true. *See* Victory Carriers, Inc. v. Law, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971), as cited and discussed, *infra*.

age or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land."

Clearly the Act extends admiralty jurisdiction to shore-based injuries. We find that a close reading of Gutierrez v. Waterman Steamship Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963), and Victory Carriers, Inc. v. Law, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971), is more than helpful in our efforts to determine the limits of admiralty jurisdiction under the Act.

In *Gutierrez* the Court held that admiralty jurisdiction exists when a shipowner commits a tort while or before the ship is being unloaded and the impact is felt ashore at a time and place not remote from the wrongful act. Gutierrez, a longshoreman working on the dock, was injured when he slipped on loose beans that had leaked from defective cargo container bags. The shipowner had allowed the cargo to be discharged in defective bagging and should have realized the danger. The Court concluded that an unseaworthiness claim could be predicated upon the use of defective cargo containers.

■ Naturally *Gutierrez* had an expansive effect on the scope of jurisdiction in admiralty cases. In *Victory Carriers* the Court clarified the scope of this jurisdiction as broadened by *Gutierrez* in its application of the Act. Bill Law, a longshoreman working on the docks, was injured by a defective forklift truck while loading a ship. The forklift was owned by the stevedoring company and was not a part of the ship's gear. In denying recovery against the shipowner the Court stressed

that the plaintiff was not injured by an appurtenance of the ship, an essential element if admiralty jurisdiction is to be invoked under the Act. The Court approved its holding in *Gutierrez*, noting that the jurisdictional question posed in *Gutierrez* turned, not on the function the longshoreman was performing at the time of his injury (*i. e.,* whether engaged in the traditional work of a seaman) but, rather, upon the fact that his injury was caused by an appurtenance of the ship, the defective cargo containers. The Court stated that reliance upon the "gangplank line" as the presumptive boundary of admiralty jurisdiction is best, except for cases where a ship's appurtenance causes damage ashore. Thus, *Victory Carriers* and *Gutierrez,* read and considered together, combine to formulate the following rule: Admiralty jurisdiction extends to shore-based workers who are injured by an appurtenance of the ship at a time and place not remote from the wrongful act of the shipowner. It must be remembered, however, that the Court in *Victory Carriers* addressed itself only to jurisdiction. We do not interpret *Victory Carriers* to affect in any way the limits of warranty coverage.

■■ Apparently the district court had little difficulty in finding the existence of admiralty jurisdiction under the facts here. We, too, find jurisdiction established. The instrumentality of the injury was a ship's cargo container (the wire bands around the bales).[6] Cargo containers coming from a vessel's hold satisfy the appurtenance requirement of *Victory Carriers.*[7] Once cargo is accepted the shipowner becomes responsible for any injury caused by a defective condition of the cargo containers wheth-

---

**6.** Wire bands binding cargo have been considered cargo containers. *See* Gutierrez v. Waterman S. S. Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); Atlantic & Gulf Stevedores, Inc., v. Ellerman Lines, Ltd., 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962).

**7.** Victory Carriers, Inc. v. Law, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971), gives

us a clear indication that cargo containers are considered appurtenances of a ship. "The decision in *Gutierrez* turned . . . upon the fact that his injury was caused by an appurtenance of a ship, *the defective cargo containers . . . .* " *Id.* at 210–211, 92 S.Ct. at 424. (Emphasis added.)

er the injury occurs aboard the vessel or on the dock.[8] From the record it is clear that the ship's crew observed cargo containers leaving the ship in a defective condition for over three hours.[9] The accident occurred between twenty-five and fifty feet from the side of the ship, during a discharge operation that was continuous. We agree with the district court that the requirement of *Gutierrez* that "the injury not be remote in time and place from the wrongful act" has been satisfied. For these reasons we hold that admiralty jurisdiction does exist[10] and we now turn our attention to the theories and limits pertinent and unique to warranty coverage.

## II

■ The principle that a shipowner is "liable to an indemnity for injuries received by *seamen* in consequence of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship" has long been recognized as a part of American admiralty law. The Osceola, 189 U.S. 158, 175, 23 S.Ct. 483, 487, 47 L.Ed. 760 (1903) (emphasis added).

This principle has evolved with the historical development of maritime law.[11] We must, therefore, turn to case law to determine whether, on the facts before us, Garrett falls within the definition of "seamen"—those individuals traditionally entitled to recover for injuries under the warranty of seaworthiness.

■ ■ The definition of the word "seamen" has long been the subject of litigation,[12] but it is clear that the term includes anyone who, in the course of his work about a ship, exposes himself to the risks traditionally associated with the maritime duties of a member of the ship's crew. International Stevedoring Co. v. Haverty, 272 U.S. 50, 52, 47 S.Ct. 19, 71 L.Ed. 157 (1926). Thus, a longshoreman, injured while engaged in such maritime duties, may recover from the shipowner where his injury is caused by the unseaworthy condition of the ship or its equipment.[13]

■ Often the question of whether a longshoreman is engaged in work traditionally done by a seaman will be a question of fact for the jury. Bodden v. Coordinated Caribbean Transport,

---

8. The Admiralty Extension Act, 46 U.S.C. § 740, initially extended admiralty jurisdiction shoreward. Gutierrez v. Waterman S. S. Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed. 2d 297 (1963), established that jurisdiction existed on the dock if the shipowner discharged defective cargo containers.

9. A fact crucial to establishing a maritime cause of action under the Admiralty Extension Act is that the cargo containers were defective when they left the ship. Green v. Pope & Talbott, Inc., 459 F.2d 365, 368 (4 Cir. 1972).

10. Diversity jurisdiction under 28 U.S.C. § 1332 was specifically asserted in the complaint. The complaint on its face, however, does clearly allege facts upon which admiralty jurisdiction can be supported. Therefore, we think it unnecessary to determine whether diversity jurisdiction did exist. This approach eliminates the need to consider the extent to which maritime law is applicable in a diversity action. *See generally* McNeil v. A/S Havbor, 339 F.Supp. 1264 (E.D.Pa. 1972).

11. An excellent discussion of the historical development of the warranty of seaworthi-

ness appears in G. Gilmore and C. Black, Jr., The Law of Admiralty 315–32 (1957).

12. As early as 1848 the United States Supreme Court found it necessary to determine whether "seamen" as the term appeared in 5 Statutes at Large 153, included marines. Wilkes v. Dinsman, 48 U.S. (7 How.) 89, 12 L.Ed. 618 (1848). Since enactment of the Jones Act, 46 U.S.C. § 688, litigation of that word has increased dramatically. See cases collected in Annot., 75 A.L.R.2d 1312 (1961).

13. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 99, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

On appeal no challenge has been made to the premise that defective cargo bands constitute an unseaworthy condition. That question was fully considered in Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962), which is controlling on the issue. There, a longshoreman was injured when a bale of burlap fell on him because a defective metal band wrapped around the bale broke. The Court upheld an award of damages, noting that unseaworthiness could be predicated upon the defectiveness of the metal bands.

Inc., 369 F.2d 273 (5 Cir. 1966). Yet there are instances where the court should find as a matter of law that the longshoreman's duties were those of a seaman. *See* Usiak v. New York Tank Barge Co., 299 F.2d 808, 811 (2 Cir. 1962). As early as 1914, the United States Supreme Court held that one engaged in loading and stowing a ship's cargo was engaged in "the performance of a maritime service" which was "absolutely necessary to enable the ship to discharge its maritime duty," and was, therefore, entitled as a matter of law to maintain a libel on the theory of unseaworthiness. Atlantic Transport Co. v. Imbrovek, 234 U.S. 52, 61–62, 34 S.Ct. 733, 735, 58 L.Ed. 1208 (1914). Thus, one engaged in the process of loading or unloading a ship is engaged in the work of a seaman and is entitled to the benefits of the warranty of seaworthiness conferred upon all seamen in the ship's service. Gutierrez v. Waterman Steamship Corp., 373 U.S. 206, 214–215, 83 S. Ct. 1185, 10 L.Ed.2d 297 (1963); Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 413, 74 S.Ct. 202, 98 L.Ed. 143 (1953).

 The district court noted this proposition but held that Garrett's duties did not constitute unloading as that word was understood and applied in the case law; therefore, it refused to rule *as*

*a matter of law* that Garrett was doing work traditionally done by a seaman. Since Garrett had relied on the broad definition of that term and presented no evidence to the jury respecting the traditional duties of a seaman, the court held that Garrett failed to prove his case.[14] The court apparently concluded that "unloading" ceases when the cargo is no longer in contact with the ship, *i. e.*, when the bales were deposited on the pier and discharged from the ship's gear. Although we find this theory appealing because of its ease of application, we believe that the case law rejects such a narrow definition of "unloading."

 At the outset we observe that the remedy provided by the warranty of seaworthiness is to be liberally applied to carry out its humanitarian purpose.[15] Thus, the cases have broadly defined the word "seaman," [16] have extended the list of devices considered a part of the ship's gear,[17] and have expanded the definition of unseaworthiness.[18] A member of the crew is no longer denied recovery for injuries sustained in the ship's service merely because he is ashore at the time the injury is suffered;[19] likewise a longshoreman when engaged in the duties of a seaman is entitled to maritime

14. Although it is clear that a plaintiff must establish that he was injured while doing work traditionally done by a seaman to recover under the warranty of seaworthiness, *see* Seas Shipping Co. v. Sieracki, 328 U.S. 85, 95, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), that aspect has often been treated *sub silentio* where the plaintiff was engaged in the loading or unloading process and no issue of coverage was raised. *E. g.*, Gutierrez v. Waterman S. S. Corp., 373 U.S. 206, 83 S. Ct. 1185, 10 L.Ed.2d 297 (1963), and Tucker v. Calmar S. S. Corp., 457 F.2d 440 (4 Cir. 1972).

15. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

16. International Stevedoring Co. v. Haverty, 272 U.S. 50, 47 S.Ct. 19, 71 L.Ed. 157 (1926); Offshore Co. v. Robison, 266 F.2d 769, 780 (5 Cir. 1959); Baltimore & Ohio

R. R. v. Zahrobsky, 68 F.2d 454, 455 (4 Cir. 1934).

17. Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962); Alaska S. S. Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L. Ed. 798 (1954).

18. Valerio v. Am. President Lines, Ltd., 112 F.Supp. 202 (S.D.N.Y.1952); Robillard v. A. L. Burbank & Co., 186 F.Supp. 193 (S.D.N Y.1960), and cases cited therein; *see* The *Doctrine of Unseaworthiness in the Lower Federal Courts*, 76 Harv.L.Rev. 819 (1963); *see also* Annot., 77 A.L.R.2d 829 (1961).

19. Strika v. Netherlands Ministry of Traffic, 185 F.2d 555 (2 Cir. 1950); *cf.* O'Donnell v. Great Lakes Dredge & Dock Co., 318 U.S. 36, 63 S.Ct. 488, 87 L.Ed. 596 (1943) (allowing recovery by a seaman injured ashore while doing maritime work under the Jones Act, 46 U.S.C. § 688).

remedies if jurisdiction resides in an admiralty court.[20] In view of this obvious trend to fully develop the humanitarian purposes of the warranty of seaworthiness we find no reason to apply a hypertechnical definition to the terms loading and unloading.[21]

In Hagans v. Ellerman & Bucknall Steamship Co., 318 F.2d 563 (3 Cir. 1963), the court upheld a recovery by the claimant-longshoreman for injuries sustained while stacking cargo at a pier building after the cargo was discharged from the ship's hold and carried by trucks to the building. The court found the work was "an integral part of the unloading of the vessel" since the pier apron could not accommodate the cargo. 318 F.2d at 571. Thus, the court concluded that "as a matter of law he was in the ship's service" and entitled thereby to the "protection of the doctrine of unseaworthiness." 318 F.2d at 571; *see also* Huff v. Matson Navigation Co., 338 F.2d 205 (9 Cir. 1964), and Spann v. Lauritzen, 344 F.2d 204 (3 Cir. 1965). Chagois v. Lykes Brothers Steamship Co., 432 F.2d 388 (5 Cir. 1970), upheld an award of damages to a longshoreman injured on the pier adjacent to a ship while transferring grain from a boxcar to the ship; Chagois was engaged in "an essential part of an unbroken sequence of moving the . . . [cargo]

from the pier to the ship." 432 F.2d at 391 (footnote omitted).

In the case at bar the district court distinguished the cases discussed above by noting that they were decided immediately after *Gutierrez* and prior to "the limitations imposed by *Victory Carriers.*" We believe the court incorrectly interpreted *Victory Carriers*; it has extended *Victory Carriers'* limitations upon *jurisdiction* by analogy to justify rigid limitations upon the *scope of protection afforded by the warranty of seaworthiness.* Constitutional limitations upon federal jurisdiction[22] and the absence of specific statutory authorization[23] weighed heavily in limiting admiralty jurisdiction in *Victory Carriers.* However, where, as in the instant case, jurisdiction clearly exists those factors do not compel limitations upon the warranty of seaworthiness. The Supreme Court has historically limited the scope of admiralty jurisdiction,[24] but, as noted above, there has also been a trend to expand the scope of protection afforded by the warranty of seaworthiness where admiralty jurisdiction is found to exist.[25]

In defining the term unloading in this case the district court referred to its prior decision in Drumgold v. Plovba, 260 F.Supp. 983 (E.D.Va.1966). In an effort to limit the shoreward encroach-

20. "We . . . hold that the duty to provide a seaworthy ship and gear, including cargo containers, applies to longshoremen unloading the ship whether they are standing aboard ship or on the pier." Gutierrez v. Waterman S. S. Corp., 373 U.S. 206, 215, 83 S.Ct. 1185, 1191 (1963).

21. "The obvious trend of the Supreme Court decisions is toward providing ever increasing protection for crewmen, longshoremen and even others employed by independent contractors who may be called upon to work aboard vessels." Scott v. Isbrandtsen Co., 327 F.2d 113, 124 (4 Cir. 1964). That observation remains true and has been enhanced by subsequent decisions of the Supreme Court which have further extended that protection to shore-based workers.

22. *E. g.*, Washington v. W. C. Dawson & Co., 264 U.S. 219, 44 S.Ct. 302, 68 L.Ed. 646 (1924).

23. *See* Swanson v. Marra Bros., 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045 (1946); *cf.* Healy v. Ratta, 292 U.S. 263, 54 S.Ct. 700, 78 L.Ed. 1248 (1934).

24. Romero v. International Terminal Operating Co., 358 U.S. 354, 379–380, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). See cases collected in Victory Carriers v. Law, 404 U.S. 202 at 205–207 nn. 2, 3 and 5, 92 S.Ct. 418 (1971).

25. *E. g.*, Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960).

As this circuit has noted in Scott v. Isbrandtsen Co., 327 F.2d 113 (4 Cir. 1964), where jurisdiction exists the trend is to liberally construe the scope of protection. See note 21, *supra*.

ment of law peculiarly adapted to maritime situations, the court in *Drumgold* chose to restrict the definitions of loading and unloading, excluding many shore-based workers from the warranty of seaworthiness. We, however, are guided by the historical development of the warranty rather than arbitrary definitions of admittedly amorphous terms.[26] Without comment as to the correctness of the decision in *Drumgold,* we take note that the question of jurisdiction was not there considered. Since neither of the two shore-based plaintiffs in that case was injured by a ship or its appurtenance, it would appear that no admiralty jurisdiction existed and that the shoreward encroachment of maritime law could have been halted by application of the limits on jurisdiction.[27]

The record in the instant case demonstrates that it was necessary to move the bales away from the side of the ship as they were discharged from the ship's gear so that additional bales could be unloaded. It was, therefore, a "necessary step in the unloading operation." Additionally, the shipowner was obligated by contract with the consignee of the cargo to place the bales in the shed; prior to the advent of longshoremen, this obligation of the shipowner would necessarily have been performed by members of the ship's crew.[28] Logic compels the conclusion that Garrett was, *as a matter of law,* engaged in the work of a seaman; he is thus entitled to the protection afforded by the warranty of seaworthiness. This result is fully supported by the decision of the Third Circuit in Hagans v. Ellerman & Bucknall Steamship Co., 318 F.2d 563 (3 Cir. 1963), the facts there being indistinguishable from those before us.

### III

We conclude that the trial judge erred in setting aside the jury award of damages to Garrett and entering judgment for shipowner. Therefore, we reverse the judgment and remand with instructions that the jury's verdict be reinstated. When judgment was entered for shipowner its claim of indemnity against Tidewater was rendered moot; upon remand further proceedings consistent with this opinion will be necessary with respect to that issue.

Reversed and remanded with instructions.

26. "Reliance upon the gangplank line as the presumptive boundary of admiralty *jurisdiction*, except for cases in which a ship's appurtenance causes damage ashore, recognizes the traditional limitations of admiralty jurisdiction . . . and decreases the arbitrariness and uncertainties surrounding amorphous definitions of 'loading.'" Victory Carriers, Inc. v. Law, 404 U.S. 202, 214 n. 14, 92 S.Ct. 418, 426 (1971) (emphasis added).

However, in determining whether Garrett is entitled to the protection afforded by the warranty of seaworthiness (*i. e.,* was doing work traditionally done by a seaman) we, like the district court, find it necessary to consider the meaning of the terms loading and unloading.

27. *See* Victory Carriers v. Law, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971).

28. "Historically the work of loading and unloading is the work of the ship's service, performed until recent times by members of the crew. . . . That the owner seeks to have it done with the advantages of more modern divisions of labor does not minimize the worker's hazard and should not nullify his protection." Seas Shipping Co. v. Sieracki, 328 U.S. 85, 96, 66 S.Ct. 872, 878, 90 L.Ed. 1099 (1946).