Inez Marie DRACHENBERG, widow of Tracy V. Lilly, Plaintiff-Appellant,

v.

CANAL BARGE COMPANY, INC., Jena Marine Corporation and XYZ Insurance Company, Defendants-Appellees.

No. 74–2050.

United States Court of Appeals, Fifth Circuit.

April 21, 1978.
Rehearing Denied May 18, 1978.

Christopher Tompkins, New Orleans, La., for plaintiff-appellant.

Robert B. Acomb, Jr., New Orleans, La., for defendants-appellees.

Before BROWN, Chief Judge, and WISDOM and COLEMAN, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Tracy V. Lilly (Decedent), an employee of the Freeport Gulf Sulphur Company, was supervising the unloading of molten sulphur from a barge in the Mississippi River into storage tanks on the shore, when the marine unloading arm which connected the barge piping system to the storage tanks broke, spilling molten sulphur on Lilly and causing injuries which resulted in his death. Decedent's widow, Inez Marie Drachenberg (plaintiff) brought suit against the barge company for damages for her husband's death. The District Court, although finding that admiralty jurisdiction attached because the accident occurred on the deck of the barge, denied recovery. Crucial to its judgment were its findings and conclusions of law (i) that the marine unloading arm affixed to the barge was not an appurtenance of the barge, under *Victory Carriers, Inc. v. Law,* 1971, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383, 1972 A.M.C. 1; (ii) that the owners of the barge and the barge crew were guilty of no negligence whatsoever; (iii) that Decedent was not a *Sieracki*[1] seaman; (iv) that the sole proximate cause of Decedent's accident was his own negligence; and (v) that Decedent was 100% contributorily negligent. Because we find that Decedent was a *Sieracki* seaman entitled to a guarantee of seaworthiness, which guarantee extended to the unloading arm, and that the marine unloading arm was unseaworthy, that the doctrine of assumption of risk is inapplicable here, and that the finding that Decedent was 100% contributorily negligent is clearly erroneous, we reverse the District Court and remand for trial on the issue of damages.

On May 6, 1972, the Tow Boat M/V ELIZABETH HUGER[2] and the unmanned barge CBC–31[3] were moored at the Freeport sulphur unloading facility at the Stauffer Chemical Dock on the Mississippi River in Baton Rouge, Louisiana. The barge, handled by the crew from the ELIZABETH HUGER, was laden with a cargo of liquid molten sulphur maintained at 270° Fahrenheit. The cargo sulphur was owned by Freeport Sulphur Company, Inc., and was to be unloaded into the Freeport storage tanks located at the Freeport unloading dock facility.

The Decedent was employed by Freeport as Transportation Manager and Terminal Supervisor. Although he maintained an office in the Freeport office in the Commerce Building in New Orleans, where he had a desk job, he was required to go to Baton Rouge whenever sulphur was being unloaded, in order to supervise the unloading. Decedent had overall control of the dock facility, which included the responsibility for the inspection and maintenance of all machinery and equipment and the arranging for whatever repairs were necessary. He was also in charge of operating all of Freeport's dock equipment and had general supervision of the unloading of molten sulphur from barges.

The dock had a piping system which permitted barges to be unloaded and their cargoes to be pumped directly into the shoreside lines and then into Freeport's tanks on shore. This dock-side piping system was permanently affixed to the dock. Presumably to permit the molten sulphur to be pumped into tanks or other containers, where as it cooled it would solidify, the discharge line ran vertically to an elevation of approximately 55 to 60 feet (the water level being approximately 23 feet). The

---

1. *Seas Shipping Co. v. Sieracki,* 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, 1946 A.M.C. 698.

2. Owned and operated by Canal Barge Company, Inc.

3. Owned by Jena Marine Corporation and operated by Canal Barge Company, Inc.

critical element in the dock piping system was a marine unloading arm made of aluminum consisting of a series of swivel joints, 90° elbow pipes, and straight pipes. The arm connected by a swivel joint to the seaward edge of the dock piping system at an elevation of 43 feet. The arm was in two sections of substantially equal length. The two sections were joined by a swivel joint. At the vessel end of the second pipe was a 90° elbow which by a swivel was connected to a similar elbow which in turn was bolted to the flange on a short extension of the barge's header. This extension, likewise a short 90° elbow, was bolted by a flange to the header. The connection from the pipe to the elbow attached to the barge's header was during operation somewhat in the shape of an horizontal "S". There was a wire cable from the area of the swiveled joint between the two sections of pipes running vertically to an electrical hoist at an elevation exceeding 60 feet. The function of this arrangement was to permit three dimensional movement—vertically as the barge's draft lessened with cargo discharge, horizontally as the barge moved to and from the dockside from current, swells or waves in the river, and longitudinally as like forces moved the barge up or down the dock plus a combination of one or more or all these movements.

Although the loading arm was a permanent part of the dock-side piping system it is obvious that it and the receiving connections permanently on the barge were designed to function together as an integrated system, each being indispensable and neither being more important than the other. Like the good marriage it was one no man could put asunder.

On May 6, 1972, during the unloading of the barge, Decedent operated the electric hoist and lowered the marine unloading arm down to the members of the crew of the ELIZABETH HUGER, who were handling the barge. These crew members secured the nuts and bolts which connected the 90° elbow flange of the dock-side unloading arm to the barge piping system. Under Decedent's directions, pumping was started. At 11:50 a. m., pumping was shut

down due to a clogged or plugged side line. Decedent cleared the line and pumping started again at 3:30 p. m.

At 8:00 p. m., Decedent went on board the barge to talk with a mate of the ELIZABETH HUGER's crew. He told the mate that he was going to gauge the shoreside tanks and would signal to him with a flashlight when the tanks were full, so that pumping operations could be shut down. Ending this discussion, Decedent turned and walked on the deck of the barge toward the dock, where he was going to measure the tanks. While walking across the deck of the barge toward the dock, the marine unloading arm, part of which hung over the deck of the barge, broke.

The swivel joint in the center of the horizontal "S" connection broke. The break involved only the unloading arm and not the regular barge piping system. After the break the severed loading arm, still connected to the seaward edge of the dock piping system and supported by the electric hoist, swung away about three feet from the opening created by the rupture. Molten sulphur poured backwards out of the arm, covering Decedent, and causing the injuries from which he died eight days later.

The District Court found as a fact—a fact not disputed here—that "the arm broke as a direct result of the fact that the last section of the dock-side unloading arm was reversed so that there was not the proper number of swivels in the arm at the point where the swivels were required to allow the arm to move freely with anticipated movement of the barge." The record also discloses that, on several previous occasions, Decedent had had trouble with the unloading arm and had supervised its repair. However, the reasons thought by Decedent and his supervisors at Freeport to be causing the failures of the arm were bad welds, deteriorated swivel joints, worn out ballbearings and the like. The evidence does not support a finding that Decedent or any others at Freeport were aware that the last section of the loading arm was reversed

or that there was any risk in using the arm. The uncontradicted testimony of Decedent's predecessor at the Freeport dock shows that the unloading arm was in this reversed position the entire time he worked for Freeport as dock supervisor, so that the arm was in a reversed position when Decedent took over the job. The evidence also shows that an engineering study conducted by Freeport's engineering department prior to the accident for the purpose of recommending necessary improvements in the unloading arm did not disclose the reversal of the last section of the arm. Thus, although Decedent and Freeport knew that something had gone wrong with the arm in the past, there was no explicit evidence that the last section of the arm was reversed or that there was reason for them to suspect that there was any particular risk involved in using the arm.

The liability stage at this trial was before a Judge sitting without a jury, and his disposition of the case made trial on damages unnecessary. In his findings of fact, he found, among others, that (i) Decedent "knew or should have known that the lower arm of the unloading arm was installed backwards;" (ii) Decedent's work was "not that of a seaman or member of a crew of a vessel but was the work of a shore side employee;" (iii) the "dock-side unloading arm was permanent shore side equipment and not a part of the ship's equipment;" (iv) the "equipment was not an appurtenance of the vessel and not attached to the vessel despite the temporary fixing of the arm to the barge discharge piping; [4]" (v) there is "maritime jurisdiction based upon the fact that Mr. Lilly was injured while physically on the barge itself;" (vi) "Canal Barge Company, Inc. and its crew were not guilty of any negligence contributing to this casualty, and that their actions were those of reasonable men under the circumstances;" (vii) "the accident resulting in Mr. Lilly's death was caused solely because of his own negligence and alternatively, Mr. Lilly's actions and failure to act constituted 100% contributory negligence on his part which would bar recovery herein."

In his conclusions of law, the District Court found, among others, that (i) "the pier side unloading arm * * * was not part of the [Barge] or the M/V ELIZABETH HUGER's usual gear or that was stowed on board and accordingly this is not a basis for maritime jurisdiction," citing *Victory Carriers, Inc., v. Law*, 1971, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383, 1972 A.M.C. 1, reh. denied, 404 U.S. 1064, 92 S.Ct. 731, 30 L.Ed.2d 753; (ii) "the shore side unloading arm was not attached to the vessel in the manner contemplated [in] *Victory Carriers, supra*, and was merely a temporary attachment permanently affixed to the shore and not an appurtenance of the ship and never disconnected from the shore and accordingly would not be a basis for maritime jurisdiction;" (iii) the District Court did have maritime jurisdiction "based purely and simply on the fact that the Plaintiff's Decedent was injured while on board the barge itself rather than on the dock;" (iv) "Canal Barge Company, Inc. and/or its crew were not guilty of any negligence whatsoever in this case;" (v) Decedent was not a *Sieracki* seaman; (vi) it was incumbent upon Decedent to inspect, repair, maintain and properly assemble the unloading arm, and that because "the sole proximate cause of Mr. Lilly's accident was his own negligence, * * * the claim brought by the plaintiff on the issues of negligence and unseaworthiness is * * * denied;" (vii) even if the Court should hold the unloading arm unseaworthy, no recovery is possible because the District Court's finding of Decedent's 100% contributory negligence would bar recovery.

*Preliminary Matters*

Before proceeding to the heart of this analysis, we emphasize that this accident occurred before the passage of the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S. C.A. § 901, *et. seq.* The legislative history

---

4. "It is noted that the arm, once it was secured to the dock was never moved or intended to be moved from the dock and was a permanent fixture of the dock itself."

of these amendments convinces us that they were to have only prospective effect, so that we need not concern ourselves with the effect of the amendments [5] upon the accident occurring here. *See, e. g.,* 118 Cong. Rec. H 1043 (Daily Ed. Oct. 14, 1972); *see also Martinez v. Dixie Carriers, Inc.,* 5 Cir., 1976, 529 F.2d 457; *McCawley v. Ozeanosun Co., Maritime, S. A.,* 5 Cir., 1974, 505 F.2d 26, 1975 A.M.C. 480; *Addison v. Bulk Food Carriers, Inc.,* 1 Cir., 1974, 489 F.2d 1041, 1974 A.M.C. 652.

Second, we conclude that the record fully supports the District Court's finding that the Canal Barge Company and the crew of the ELIZABETH HUGER were in no way negligent and that their actions were those of reasonable men under the circumstances. Thus, if Plaintiff is to recover at all, it cannot be under a Jones Act negligence claim, but must be under a maritime law seaworthiness claim. We also agree with the District Court's conclusion that the unloading arm was permanently affixed to the dock.

Finally, we conclude that the District Court's finding and conclusion that Decedent was 100% contributorily negligent was clearly erroneous. Although we make no guesses here as to the extent of Decedent's contributory negligence, if any, we conclude that there is no reasonable reading of the record which will support the District Court's finding that Decedent's negligence was the sole proximate cause of his accident. *See Manning v. M/V Sea Road,* 5 Cir., 1969, 417 F.2d 603, 1970 A.M.C. 145.

### Maritime Jurisdiction

■ Under the locality rule, in determining maritime tort jurisdiction the location of the accident on navigable waters [6] is to be given nearly controlling weight.[7] The only restriction on this is *Executive Jet*'s [8] requirement that the claim must bear a significant relationship to traditional maritime activity. The extensions to the rule are extremely short, and are either based in a federal statute (such as the Admiralty Extension Act of 1948, 46 U.S.C.A. § 740; *see, e. g., Gutierrez v. Waterman Steamship Corp.,* 1963, 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297, 1963 A.M.C. 1649, *reh. denied,* 374 U.S. 858, 83 S.Ct. 1863, 10 L.Ed.2d 1082), or in the limited situations implied by the Supreme Court's discussion in *Victory Carriers.*[9] Thus, maritime jurisdiction will almost always exist when an accident occurs on the deck of a ship in navigation and it arises out of operations having a significant relationship to traditional maritime activity.

---

5. For a thorough discussion of the new amendments, *see* Gilmore & Black, The Law of Admiralty 408–56 (2d Ed. 1975); Robertson, Negligence Actions by Longshoremen Against Shipowners Under the 1972 Amendments to the Longshoreman's and Harbor Workers' Compensation Act, 7 J.Mar.L. & Comm. 447 (1976). *See generally* Robertson, Admiralty Procedure and Jurisdiction after the 1966 Unification, 74 Mich.L.Rev. 1628 (1976); Robertson, Injuries to Marine Petroleum Workers: A Plea for Radical Simplification, 55 Tex.L.Rev. 1973 (1977).

The Supreme Court first construed amendments in *Northeast Marine Terminal Co., Inc. v. Caputo,* 1977, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320.

6. *See, e. g., Pope & Talbot, Inc. v. Hawn,* 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143, 1954 A.M.C. 1; *Kelly v. Smith,* 5 Cir., 1973, 485 F.2d 520, *cert. denied,* 1974, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558; *Delome v. Union Barge Line Co.,* 5 Cir., 1971, 444 F.2d 225, 1971 A.M.C. 1837, *cert. denied,* 1972, 404 U.S. 995, 92 S.Ct. 534, 30 L.Ed.2d 547.

7. The locality rule was given extensive recognition in *Victory Carriers, Inc. v. Law,* 1971, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383, 1972 A.M.C. 1, where the Court cited over 40 cases which had reiterated the rule. *See* 404 U.S. at 205 n. 2, 92 S.Ct. at 421 n. 2, 30 L.Ed.2d at 387 n. 2. The Court acknowledged that:

"The historic view of this Court has been that the maritime tort jurisdiction of the federal courts is determined by the locality of the accident and that maritime law governs only those torts occurring on the navigable waters of the United States."

*Id.* at 205, 92 S.Ct. at 421, 30 L.Ed.2d at 387.

8. *Executive Jet Aviation, Inc. v. City of Cleveland,* 1972, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454, 1973 A.M.C. 1.

9. *See* quote from *Victory Carriers* (404 U.S. at 213–14, 92 S.Ct. at 426, 30 L.Ed.2d at 392) at page 918, *infra.*

In this case, we agree with the District Court's finding that it had maritime jurisdiction over this case because the accident occurred on the deck of the barge, which was in navigable waters at the time, the accident arising out of an incident directly connected with traditional maritime activity—the unloading of the ship's cargo.

### Sieracki Seamen

In *Sieracki*, the Supreme Court phrased the issue as "whether the obligation of seaworthiness, traditionally owed by an owner of a ship to seamen, extends to a stevedore injured while working aboard the ship." 328 U.S. at 87, 66 S.Ct. 872, at 874, 90 L.Ed.2d at 1102. The Court answered this question by saying that "when a man is performing a function essential to maritime service on board a ship the fortuitous circumstances of his employment by the shipowner or a stevedoring contractor should not determine the measure of his rights." *Id.* at 97, 66 S.Ct. 872, at 878, 90 L.Ed. at 1107. Thus, "for injuries incurred while working on board the ship in navigable waters the stevedore is entitled to the seaman's traditional and statutory protections, regardless of the fact that he is employed immediately by another than the owner. For these purposes, he is, in short, a seaman because he is doing a seaman's work and incurring a seaman's hazards." *Id.* at 99–100, 66 S.Ct. 872, at 879, 90 L.Ed. at 1108–09.

In *Pope & Talbot, Inc. v. Hawn*, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143, 1954 A.M.C. 1, the Supreme Court was asked by appellant in that case either to overrule *Sieracki* or distinguish it on its facts, on the ground that Sieracki was a stevedore, while Hawn was a carpenter who was injured when he fell through an uncovered hatch hold on a ship on which he was repairing grain loading equipment. The Court resoundingly reaffirmed *Sieracki* and held that *Sieracki* was not distinguishable from the facts in *Pope*:

"We * * * adhere to Sieracki. We are asked, however, to distinguish this case from our holding there. It is pointed out that Sieracki was a 'stevedore.' Hawn was not. And Hawn was not loading the vessel. On these grounds we are asked to deny Hawn the protection we held the law gave Sieracki. These slight differences in fact cannot fairly justify the distinction urged as between the two cases. Sieracki's legal protection was not based on the name 'stevedore' but on the type of work he did and its relationship to the ship and to the historic doctrine of seaworthiness. The ship on which Hawn was hurt was being loaded when the grain loading equipment developed a slight defect. Hawn was put to work on it so that the loading could go on at once. There he was hurt. His need for protection from unseaworthiness was neither more nor less than that of the stevedores then working with him on the ship or of seamen who had been or were about to go on a voyage. All were subjected to the same danger. All were entitled to like treatment under law."

*Id.* at 412–13, 74 S.Ct. 202, at 206, 98 L.Ed. at 152–53.

Under the principles announced in *Sieracki* and in *Pope* we have no doubt whatsoever that Decedent in this case was a *Sieracki* seaman entitled to protection from unseaworthiness of the vessel on which he was working at the time of his accident. At the time of his accident, he was engaged in the process of directing and supervising the unloading of the barge's cargo. This is a "function essential to maritime service on board a ship," as *Sieracki* requires. The entire policy underlying the historic doctrine of seaworthiness dictates that we give Decedent the protection of the warranty of seaworthiness. Decedent was a Sieracki seaman and his survivor is therefore entitled to bring a maritime claim for unseaworthiness unless—and the unless can be a big one—the thing which failed is not sufficiently related to the vessel to be a part of it. That he was, as the District Court found, shore based is no more significant than it was as to Sieracki and Hawn each of whom lived ashore as have the thousands of *Sieracki-Yakus* "seamen" whose recoveries probably sparked the 1972 amendments to

the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. §§ 901, *et seq.*

### Seaworthiness

■ The owner of the vessel has a duty to provide a vessel that is reasonably fit for its intended use. This duty to provide a seaworthy vessel requires that the vessel, its gear, appurtenances, and operation must be reasonably safe. *Seas Shipping Co. v. Sieracki*, 1945, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, 1946 A.M.C. 698. "That [a vessel] owner is liable to indemnify a seaman for an injury caused by the unseaworthiness of the vessel or its appurtenant appliances and equipment has been settled law in this country ever since The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760; *Mahnich v. Southern S. S. Co.*, 321 U.S. 96, 99, 64 S.Ct. 455, 88 L.Ed. 561, 564, and authorities cited." *Id.* at 90, 66 S.Ct. 872, at 875, 90 L.Ed. at 1103.

In *Gutierrez v. Waterman Steamship Corp.*, 1963, 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297, 1963 A.M.C. 1649, the Supreme Court concluded that "things about a ship, whether the hull, the decks, the machinery, the tools furnished, the stowage, or the cargo containers, must be reasonably fit for the purpose for which they are to be used." *Id.* at 213, 83 S.Ct. at 1190, 10 L.Ed.2d at 303. More recently, in *Usner v. Luckenbach*, 1971, 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562, 1971 A.M.C. 277, the Supreme Court said that: "A vessel's condition of unseaworthiness might arise from any number of circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. The number of men assigned to perform a shipboard task might be insufficient. The method of loading her

cargo, or the manner of its stowage, might be improper. For any of these reasons, or others, a vessel might not be reasonably fit for her intended service." *Id.* at 499, 91 S.Ct. at 517–18, 27 L.Ed.2d at 562. Consequently, for plaintiff to recover it must be determined that a maritime cause of action for unseaworthiness exists. More precisely, since the District Judge's findings regarding the negligence of the barge owner are sufficiently above the Plimsoll line of Rule 52(a), F.R.Civ.P., for plaintiff to recover it must be determined whether the warranty of seaworthiness extends to the marine unloading arm, the instrumentality which caused Decedent's death.

The Supreme Court's holding in *Victory Carriers, Inc. v. Law*, 1971, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383, 1972 A.M.C. 1, serves as the beacon by which we steer our evaluation of whether an unseaworthiness claim lies in this case. In *Victory Carriers* a longshoreman was injured on shore while he was operating a forklift truck in the process of loading a ship. The longshoreman's injury was caused when the forklift's overhead protection rack came loose and fell on him. The longshoreman was an employee of the stevedore company, and the forklift was owned and under the control of the stevedore company.

*Victory Carriers* presented the Supreme Court with a choice of law question: "The question presented here is whether state law or federal maritime law governs [this] suit . . . ." *Id.* at 202, 92 S.Ct. at 420, 30 L.Ed.2d at 385.[10] The Supreme Court concluded that no federal maritime cause of action existed under the circumstances. The underpinning of the decision was the Court's concern over the extension of maritime law to pier-side accidents.[11] The

---

10. Plaintiff's claim invoked both diversity jurisdiction under 28 U.S.C.A. § 1332 and admiralty jurisdiction under 28 U.S.C.A. § 1333. Thus, as a technical matter the Court's decision did not deal with the reach of federal subject matter jurisdiction since diversity of citizenship provided an alternative basis for jurisdiction.

11. "[T]he threshold issue is whether maritime law governs accidents suffered by a longshoreman who is injured *on the dock* by the alleged-

ly defective equipment owned and operated by his stevedore employer. We hold that under the controlling precedents, federal maritime law does not govern this accident. Nor, in the absence of congressional guidance, are we now inclined to depart from prior law and extend the reach of the federal law to *pier-side* accidents caused by a stevedore's *pier-based* equipment." 404 U.S. at 204, 92 S.Ct. at 420–21, 30 L.Ed.2d at 386–87 (emphasis added).

Court emphasized that the finding of a maritime cause of action under the facts presented in *Victory Carriers* "would raise a host of new problems as to the standards for and limitations on the applicability of maritime law to accidents on land." 404 U.S. at 214, 92 S.Ct. at 426 (footnote omitted). Thus, the Supreme Court placed a substantive limitation on at least the shoreward reach of the seaworthiness remedy.

■ The present case, however, does not involve the shoreward extension of a maritime cause of action which so concerned the Supreme Court in *Victory Carriers*. Instead, in this case the injury occurred on-ship, aboard a blue-water, navigable-water-going vessel. Accordingly, recognizing that this important difference attenuates the application to this case of the principles expressed in *Victory Carriers,* we examine that decision for the light it may reflect on whether a maritime cause of action exists under the facts of the present litigation.

The Supreme Court pointed out under the facts existing in *Victory Carriers* that "[t]he typical elements of a maritime cause of action are particularly attenuated: respondent Law was not injured by equipment that was part of the ship's usual gear or that was stored on board, the equipment that injured him was in no way attached to the ship, the forklift was not under the control of the ship or its crew, and the accident did not occur aboard ship or on the gangplank." 404 U.S. at 213–14, 92 S.Ct. at

426, 30 L.Ed.2d at 392. The last element, as emphasized above, obviously and unquestionably is satisfied in the present case. The fact that Decedent's injury was received on board, and not dock-side, carries great weight.

The other typical elements of a maritime cause of action discussed in *Victory Carriers* capsulize the Supreme Court's effort to determine whether the forklift could be considered an appurtenance of the vessel thus justifying the shoreward extension of a seaworthiness claim.[12] The Court found that the forklift which injured Law was not a piece of equipment that was part of the ship's usual gear or that was stored on board; the forklift was in no way attached to the ship; and the forklift was not under the control of the ship or its crew. Appropriately, the Supreme Court in effect concluded that the forklift used on the dock was not an appurtenance of the vessel to which the duty of seaworthiness extended.[13] In the present case, however, under the existing circumstance of an on board injury, there can be no doubt that the seaworthiness remedy lies if the instrumentality which caused Decedent's death, the marine unloading arm, was attached to or related to the vessel in such a way as to make it an appurtenance of the vessel.

In *Victory Carriers* one aspect of an appurtenance which the Court examined and found absent was *attachment* of the equip-

---

**12.** In *Gutierrez v. Waterman Steamship Corp.,* 1963, 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297, 1963 A.M.C. 1649, a longshoreman was injured on the dock while unloading a vessel. The Supreme Court's decision that the shipowner was liable for unseaworthiness turned upon the fact that the longshoreman's injury was caused by an appurtenance on the ship— the defective cargo containers. See the discussion of *Gutierrez* in *Victory Carriers, supra,* 404 U.S. at 210–11, 92 S.Ct. at 424, 30 L.Ed.2d at 390. *See also Burrage v. Flota,* 5 Cir., 1969, 431 F.2d 1229, 1970 A.M.C. 2254 (finding vessel unbeanworthy).

**13.** See the discussion on *Victory Carriers* in 7A Moore's Federal Practice, § .325 at 136 (1977–78 Supplement).

Read as an evaluation of whether under general maritime law the forklift could be found to

be appurtenant to the vessel, *Victory Carriers* can also be interpreted as dealing with the reach of federal subject matter jurisdiction in admiralty, since the Admiralty Extension Act, 46 U.S.C.A. § 740, extends jurisdiction to include injuries on land "caused by vessel", which in turn means caused by an appurtenance of a vessel. *See Whittington v. Sewer Const. Co., Inc.,* 4 Cir., 1976, 541 F.2d 427, 432 n.1; *Kinsella v. Zim Israel Navigation Co., Ltd.,* 1 Cir., 1975, 513 F.2d 701, 703 and n.4, 1975 A.M.C. 1208; *Garrett v. Gutzeit,* 4 Cir., 1974, 491 F.2d 228, 232, 1974 A.M.C. 319. Indeed, a subsequent Supreme Court case has interpreted *Victory Carriers* in exactly this fashion as a commentary on jurisdiction under the Extension Act. *Askew v. American Waterways Operators, Inc.,* 1972, 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280, 1973 A.M.C. 811.

ment to the vessel. Two Supreme Court decisions discussed in *Victory Carriers* shed light on the type of attachment of which the Supreme Court spoke. "In *Alaska S.S. Co. v. Petterson,* 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954), aff'g. 205 F.2d 478 (C.A. 9 1953), and *Rogers v. United States Lines,* 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120 (1954), rev'g. 205 F.2d 57 (C.A. 3 1954), the Court decided without opinion that unseaworthiness recovery would be possible to a longshoreman injured by equipment brought aboard ship by the stevedore company. In both of these cases, the accident occurred on navigable water: Both longshoremen were injured while in the hold of the ship by defective apparatus attached to the ship's gear." *Victory Carriers, supra,* 404 U.S. at 211 n.11, 92 S.Ct. at 424 n.11, 30 L.Ed.2d at 391 n.11.

In *Rogers, supra,* the longshoreman was injured on board while unloading ore from the cargo hold of the vessel. The operation involved the use of the ship's booms, the stevedore's land fall, the two ship's winches, a ship's runner on one of the winches and the stevedore's land fall runner on the other. All parties agreed that the longshoreman's injury was caused by the stevedore's land fall runner in the operation of one of the winches by an employee of the stevedoring company. Thus, in reversing the Court of Appeals and finding that a seaworthiness claim could lie, the Supreme Court in effect agreed that the stevedore's equipment, adopted by the vessel and incorporated with the ship's cargo handling equipment, became an appurtenance of the vessel.

Similarly, in *Petterson, supra,* a longshoreman on board a vessel was utilizing a breaking block brought aboard by the stevedoring company to unload the ship. While being used in connection with the

ship's gear in a proper manner by the longshoreman, the block broke causing his injuries. The Supreme Court affirmed the Court of Appeals' decision that a seaworthiness claim was cognizable.[14]

Coupled with the language of *Victory Carriers,* the decisions in *Rogers* and *Petterson* suggest several relevant propositions. First, certain types of temporary attachment to the vessel by equipment not part of the ship's usual gear or stored on board or controlled by the ship's crew can satisfy the requirements for finding a maritime cause of action. Next, the equipment must be utilized in a manner fundamentally related to traditional maritime activities. Finally, it must be emphasized that in both *Rogers* and *Petterson* the accidents occurred aboard ship.

In the present case the marine unloading arm, although permanently affixed to the dock, was firmly and physically attached to the vessel during the use which gave rise to the claim. The marine arm itself was a critical component integrally related to the vessel's function as a carrier of molten sulphur. Finally, identical to the accident seen in *Rogers* and *Petterson,* the injury in this case occurred on board the vessel.

One of our own opinions additionally flushes out the concept of attachment. In *Davis v. W. Bruns & Co.,* 5 Cir., 1973, 476 F.2d 246, 1973 A.M.C. 1148, two longshoremen were injured on the dock in the process of unloading bananas from a ship. One's arm became entangled in a conveyor belt which was being used to unload the bananas while the other suffered injuries when struck by boxes of bananas that fell from the conveyor belt. The longshoremen argued that the conveyor belt, which was connected by two guy wires, was "at-

**14.** See the articulation of the First Circuit in *Romero Reyes v. Marine Enterprises, Inc.,* 1 Cir., 1974, 494 F.2d 866, 1974 A.M.C. 2236, where the Court stated:

"The seaworthiness warranty is not, however, limited to gear 'owned' by the shipowner, and while the phrase 'equipment appurtenant' to the vessel suggests equipment 'belonging' physically to the vessel, it may, and

in this case does, include equipment vital to the vessel's mission that does not accompany it while at sea."

494 F.2d at 869. We do not overemphasize this case since some might consider, we do not think, it to be in conflict with our decision in *Parker v. South Louisiana Contractors, Inc.,* 5 Cir., 1976, 537 F.2d 113 (see notes 15 and 19, *infra.*), which is binding on our Circuit.

tached" to the ship and that this was sufficient to create federal admiralty jurisdiction for their claims. We found that the presence of these two guy wires was not sufficient, attachment to the ship in a sense meant by *Victory Carriers:* "The Supreme Court obviously intended 'attachment' to mean something more than the temporary affixing of steadying wires." 476 F.2d at 248. Consequently, we found federal jurisdiction wanting.

In *Davis,* we found that the connection of mere steadying wires, so common to every docking and loading operation, did not rise to the level of attachment to establish federal admiralty jurisdiction.[15] Also, the guy wires themselves were in no way defective, involved with or responsible for the injury. In contrast, in the present case the marine arm itself was firmly and physically affixed to the vessel, was crucial to the unloading to the particular cargo and was defective and responsible for plaintiff's injury. Additionally, it is highly significant that the accident in *Davis* was dock-side while the accident in this case was on board.[16]

Charting our course by these dim yet visible lights we conclude that the marine unloading arm was an appurtenance of the vessel. The marine arm was firmly and physically attached to the vessel thereby satisfying a typical element of a maritime

cause of action. Moreover, the unloading arm was an essential—indeed, crucial—part of the unloading process. The unloading of the molten sulphur from the hold of a floating barge to the immobile shore-side storage tanks was greatly facilitated by the use of the flexible marine unloading arm which linked the two and, so far as the evidence reveals, could not have been accomplished by any other means.

This case in no way involves the shoreward extension of maritime law which so concerned the Supreme Court in *Victory Carriers.* In effect, the finding that the injury occurred on board reduces the examination to a search for minimal attachment. Certainly, however, more than minimal attachment was present in this case and the warranty of seaworthiness extended to the marine unloading arm.[17] We also conclude that the marine unloading arm, without sufficient flexibility to accommodate the rise and fall of the barge in the water proved itself under normal expected use to be unfit and was, therefore, unseaworthy. *Walker v. Harris,* 5 Cir., 1964, 335 F.2d 185, 1964 A.M.C. 1759, *cert. denied,* 379 U.S. 930, 85 S.Ct. 326, 13 L.Ed.2d 342.

### Taffrail Remarks

Because we find that this claim is appropriately covered by federal maritime

---

**15.** Because the accident was pier-side in *Davis,* we focused strictly on the question of whether maritime jurisdiction existed. This necessarily involved a more rigorous examination in order to deter those seeking to extend federal admiralty jurisdiction from its water-based routes to new land-locked disputes. This is not the case in the present litigation since jurisdiction is established under the locality rule.

Also, in *Parker v. South Louisiana Contractors, Inc.,* 5 Cir., 1976, 537 F.2d 113, we found federal admiralty jurisdiction wanting. In that case an injury occurred on a ramp permanently affixed to the dock used for ingress and egress from vessels. We determined that the injury occurred not on a gangplank but on a structure most closely resembling a dock or pier. Consequently, the decision, while focusing on the jurisdictional question, concluded that a dock-like structure was not an appurtenance of the ship through which admiralty jurisdiction could be found.

Of course, the inquiry under the admiralty extension act is question begging. If the appliance is an appurtenance of the vessel admiralty

jurisdiction under the extension act exists, although the question might still remain whether substantive rights conferred by the body of law called maritime should be applied to the particular person or situation.

**16.** The importance of this single factor was underscored in *Davis,* 476 F.2d at 249, by its author, Judge Goldberg, who was acutely aware of *Victory Carriers. See, Law v. Victory Carriers, Inc.,* 5 Cir., 1970, 432 F.2d 376, *rev'd* 1971, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383.

**17.** "That longshoremen injured on the pier in the course of loading or unloading a vessel are legally distinguished from longshoremen performing similar services on the ship is neither a recent development nor particularly paradoxical. The maritime law is honeycombed with differing treatment for seamen and longshoremen, on and off the ship . . . ." *Victory Carriers, supra,* 404 U.S. at 212, 92 S.Ct. at 425, 30 L.Ed.2d at 391–92.

jurisdiction, Decedent was a *Sieracki* seaman entitled to the warranty of seaworthiness (including a warranty that the unloading arm was seaworthy), the arm was unseaworthy in fact, and Decedent was not guilty of 100% contributory negligence, we reverse the District Court and remand for trial on damages. During this trial, of course, defendants are entitled to prove the extent of Decedent's contributory negligence, if any.[18]

Finally, we wish to emphasize the narrow scope of our ruling today. First, of course, because of the change in law created by the passage of the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act, our decision today may have very little precedential effect. Second, we emphasize that our decision is in no way meant to expand federal admiralty *jurisdiction.* Our holding is limited to the situation where federal admiralty jurisdiction already exists under the locality—maritime-related—rule, where a warranty of seaworthiness already exists generally, and where the only question left to be answered is to what the warranty extends. We. hold only that, under these circumstances, the extent of this warranty of seaworthiness must be determined in a manner consistent with its underlying humanitarian policies.

Faithful as we must be to *Victory Carriers,* we are satisfied that our decision in no way ignores or improperly applies that precedent, nor have we found any cases by United States Circuit Courts that differ in analysis or application.[19]

REVERSED and REMANDED.

---

**18.** Proof of contributory negligence would go to mitigation of damages rather than to liability, of course. *See Pope & Talbot, Inc., supra,* 346 U.S. at 408–09, 74 S.Ct. at 204, 98 L.Ed. at 150, 1954 A.M.C. 1. *See also Kelloch v. S&H Subwater Salvage, Inc.,* 5 Cir., 1973, 473 F.2d 767, 1973 A.M.C. 948; *Manning v. M/V Sea Road,* 5 Cir., 1969, 417 F.2d 603, 1970 A.M.C. 145; *Grigsby v. Coastal Marine Service of Texas, Inc.,* 5 Cir., 1969, 412 F.2d 1011, *cert. denied,* 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531.

**19.** Interestingly enough, shepardizing *Victory Carriers* reveals that approximately 53 U.S. Circuit Court decisions, 43 U.S. District Court decisions, and 16 state court decisions have referred to that case.

The following is a fair summary of the pertinent United States Circuit Court decisions:

*Maritime Recovery Disallowed*

*Whittington v. Sewer Construction Co.,* 4 Cir., 1976, 541 F.2d 427 (crane located on bridge to be demolished and used to lower debris to vessel below not an appurtenance of vessel in case where plaintiff's injuries sustained when he dropped from the crane to the vessel below); *Parker v. South Louisiana Contractors, Inc.,* 5 Cir., 1976, 537 F.2d 113 (ramp permanently attached to dock not an appurtenance of vessel); *Bennett v. Faircape Steamship Corp.,* 5 Cir., 1975, 524 F.2d 979, 1975 A.M.C. 1642 (stevedore's "pineapple gear" which was to be used with ship's tackle to unload cargo but had never been aboard or connected in any way with vessel not an appurtenance of ship in dock-side injury case); *Sacilotto v. National Shipping Corp.,* 4 Cir., 1975, 520 F.2d 983, 1975 A.M.C. 1357, *cert.*

denied, 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 644 (steel billets causing shoreside injury in the process of being loaded aboard, but not yet aboard, not an appurtenance of the vessel); *Kinsella v. Zim Israel Navigation Co., Ltd.,* 1 Cir., 1975, 513 F.2d 701, 1975 A.M.C. 1208 (dunnage from vessel used on pier during unloading not an appurtenance of vessel); *Davis v. W. Bruns & Co.,* 5 Cir., 1973, 476 F.2d 246, 1973 A.M.C. 1148 (banana conveyor facility permanently affixed to shore and connected to vessel only by two steadying wires not an appurtenance of the vessel in dock-side injury case); *Snydor v. Villain & Fassio et Compania Int. Di. Genova, etc.,* 4 Cir., 1972, 459 F.2d 365 (pier-side equipment not connected with a vessel, in seven consolidated cases, held not to be appurtenances of vessel).

*Maritime Recovery Allowed*

*Huser v. Santa Fe Pomeroy, Inc.,* 9 Cir., 1975, 513 F.2d 1298 (crane affixed to barge causing dock-side injury was appurtenance of vessel); *Romero Reyes v. Marine Enterprises, Inc.,* 1 Cir., 1974, 494 F.2d 866, 1974 A.M.C. 2236 (gangway permanently affixed to pier-based tower was appurtenance of vessel); *Garrett v. Gutzeit O/Y,* 4 Cir., 1974, 491 F.2d 228, 1974 A.M.C. 319 (bales of pulp paper on pier, recently unloaded from vessel and to be moved via hand trucks to sled on pier, constituted appurtenance of vessel); *Kloster v. S.S. Chatham,* 4 Cir., 1973, 475 F.2d 43, 1973 A.M.C. 1271 (maritime cause of action cognizable where slack mooring lines and consequential excessive motion of vessel in water caused ship's hoist to dislodge pipe injuring plaintiff on pier).